NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

BLADES MANUFACTURING CORPO-
RATION, Respondent.

No. 17662.

United States Court of Appeals
Eighth Circuit.

May 10, 1965.

Joseph C. Thackery, Atty., N.L.R.B., Washington, D. C., made argument for petitioner and filed brief with Arnold Ordman, Gen. Counsel, N.L.R.B., Washington, D. C., Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel and Solomon I. Hirsh, Atty., N.L.R.B., Washington, D. C.

Bernard A. Barken, St. Louis, Mo., made argument for respondent and filed brief.

Before VAN OOSTERHOUT and MEHAFFY, Circuit Judges, and DELEHANT District Judge.

MEHAFFY, Circuit Judge.

The National Labor Relations Board has petitioned this Court pursuant to Section 10(e) of the National Labor Relations Act, 29 U.S.C.A. §§ 141–166, for enforcement of its order (144 NLRB No. 54) against Blades Manufacturing Corporation, an Arkansas company engaged in the interstate production of airplane parts. The Board found, contrary to its Trial Examiner, that the Company refused to recognize and bargain with the International Association of Machinists, AFL–CIO, the duly certified collective bargaining representative of the Company's employees at its Rector, Arkansas plant; refused to adjust employee grievances with this Union; and unilaterally granted its employees an insurance plan without consulting the Union, all in violation of § 8(a) (5) and § 8(a) (1). It also found that the Company violated § 8(a) (3) and § 8 (a) (1) in discharging thirty-one employees who struck assertedly in protest of the Company's refusal to adjust grievances.

On January 13, 1961, the Union and the Company had entered into a Board-approved Stipulation for Certification upon Consent Election. In the subsequent election on January 20, the Union lost its bid to represent the Company's production and maintenance employees by a vote of 44 to 38. The Union timely filed objections with the Board's Regional Director who had conducted the election, complaining of specific acts of misconduct by the Company during the campaign and on the day of the voting. After an investigation, the Regional Director overruled the Union's specific objections, but found evidence that two Company supervisors had threatened several employees with plant closure if the Union won the election. These threats occurred during the then critical pre-election period beginning on the date the consent agreement was signed. He concluded these threats interfered with the employees' voting freedom and recommended that the election be set aside and a second election ordered.

The Company excepted to the findings and recommendation of the Regional Director, and the Board ordered a hearing on the objections. The hearing officer credited the testimony of employees Brady, Gossett, Wortham and Mobley to the effect that during the critical week before the election, Superintendent Davis and Plant Manager Mauldin told them individually that the Company would close or move the plant if the Union came in. He discredited denials of such statements by Davis and Mauldin, and further found that these two supervisors had repeatedly made coercive antiunion statements to individual employees during the non-critical period preceding the execution of the consent election agreement. Accordingly, he concluded this antiunion background prevented the threats of plant closure during the critical week before the election from being disregarded as isolated, and, like the Regional Director, also recommended a new election be held.

In this proceeding the Company was denied, for purposes of cross-examination, the affidavits of employees Brady, Gossett and Wortham which were given the Regional Director during the course of his *ex parte* investigation of the objections.

The Board adopted the recommendation of the hearing officer, ordered another election which the Union won 55 to 33, and certified the Union on October 25, 1961.

Thereafter, the Company refused the Union's request for bargaining information, whereupon the Union filed charges. The Company admitted its refusal to bargain, but insisted it was not obliged to recognize the Union because the first election was erroneously set aside and thus the second election was void, having been held within twelve months of the first in contravention of Section 9(c) (3) of the Act, 29 U.S.C.A. § 159(c) (3).

In the unfair labor practice hearing, the Trial Examiner granted a motion for judgment on the pleadings against the Company. The Company's unsuccessful

defense had been a lack of due process of law in the prior representation hearing on objections to the election for failure to furnish it certain witnesses' pre-hearing affidavits. The Company excepted to the Examiner's findings based on credibility resolutions contained in the hearing officer's report and his ruling that Board policy forbade the right of respondent to pre-hearing affidavits in a representation case.

On review, the Board issued an order reopening the record in the representation hearing and remanded the proceedings with directions that the Company be furnished the previously requested affidavits for purposes of cross-examination. It was further ordered that:

> "At such hearing, the Trial Examiner shall consider and resolve credibility issues raised by counsel for Respondent in his exceptions to the Hearing Officer's Report in Case No. 26–RC–1553 [representation case], and at the conclusion of such hearing shall prepare and serve upon the parties a Supplemental Intermediate Report containing findings of fact, conclusions of law, and recommendations relating to the unfair labor practices alleged in this proceeding."

The Trial Examiner interpreted the remand order as requiring him to determine whether Company representatives made threats to close or move the plant in the event the Union won the election during the critical pre-election period. And, if so, were such threats sufficiently objectionable to warrant setting the election aside. He concluded that these determinations required a reassessment of the credibility of the three witnesses whose further cross-examination was authorized and who had testified to the Company misconduct during the critical period. Since the two Company supervisors were also witnesses before him in a related, consolidated, unfair labor practice case, he regarded it necessary to rule on their testimony generally, even though their denials of the threats in the prior representation case had been discredited by the hearing officer.

In the meantime, the Company had steadfastly refused to recognize and bargain with the Union and subsequently established an insurance program for its employees without conferring with the Union. In a letter dated November 18, 1961, an organizer for the Union warned that if the Company continued its refusal to bargain and adjust grievances of the employees with the Union, it could "expect future concerted moves and activities by its employees, in protest of the company's total disregard of the Act" which had been the basis for their "past concerted action." Following the second election, the Company had complained of production slowdowns by Union adherents aimed at forcing its recognition of the Union.

Thereafter, some of the employees met with the Union's organizer who advised them that if the Company continued to refuse to adjust grievances, they could "walk out for a day." These employees formed a grievance committee, and a vote was taken to walk out the next time the Company declined to meet with their Union spokesmen over a grievance.

Subsequently, on February 15 an employee received a written reprimand for insufficient production. Thereupon the Union members in the plant met and decided that if the Company refused to discuss grievances with their shop steward, they would walk out "for approximately one day at a time." When Plant Manager Mauldin refused to take up the reprimand with the shop steward but agreed only to discuss the grievance individually with the employee involved, thirty-one employees punched out before the shift had ended and did not report back to work until the following day.

Within a week the same employees staged a similar one-day walkout in protest of the Company's refusal to adjust an aggrieved employee's disciplinary layoff despite a warning from the Company against such walkouts during the interim. The Company warned these em-

ployees also by letter that their work stoppages were disrupting the Company's business and any repetition of such temporary cessations of work would result in discharge.

On February 27, the third walkout occurred after the Company refused to discuss with the shop steward the grievance of an employee given a three-day layoff for admittedly slowing down his production to get the Company to recognize the Union.

On March 1, thirty-one employees participating in the walkout were notified by letter from the Company of their discharge for engaging in unprotected activity despite previous warnings.

In his supplemental intermediate report, the Trial Examiner discredited the testimony of witnesses Brady, Gossett and Wortham that they had been threatened during the critical pre-election period by supervisors Mauldin and Davis. Therefore, he concluded that the single threat to Mobley by Davis on the eve of the election that the plant would be moved if the Union were victorious was insufficient standing alone to justify setting the first election aside. Thus, he ruled the second election within twelve months invalid, held, therefore, the Company was under no duty to recognize and bargain with the Union, and dismissed all § 8(a) (5) and derivative § 8(a) (1) charges.

He further held that the Company had not discriminatorily discharged the thirty-one strikers because their prearranged walkouts for a short duration was a form of concerted activity unprotected by Section 7 of the Act. 29 U.S.C.A. § 157.

In reversing the Trial Examiner, the Board concluded that Davis' coercive statement to Mobley during the critical period when considered against the pre-critical period background of extensive antiunion discussions by supervisors Davis and Mauldin with other individual employees prevented the holding of a free election. Correspondingly, the Board also found that each walkout was precip-itated by the Company's unlawful refusal to recognize the Union's right to adjust grievances on behalf of the employees. Therefore, each separate strike was deemed a protected concerted activity, participation in which could not be the basis of a valid discharge.

■ In considering this petition for enforcement, we are aware that Congress has entrusted the Board with broad discretion in establishing and carrying out the processes by which employees are assured a fair and free election of bargaining representatives. National Labor Relations Board v. A. J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 91 L.Ed. 322 (1946); Iowa Beef Packers, Inc. v. NLRB, 331 F.2d 176, 183 (8th Cir. 1964).

■ We are equally conscious of the fact that Congress has not provided for a direct judicial review of a certification of a union as bargaining agent, but the attack on the election generally can only be reviewed as part of the record in an unfair labor practice hearing on a refusal to bargain charge as the Company proceeded here. Boire v. Greyhound Corp., 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964); NLRB v. Clearfield Cheese Co., 322 F.2d 89 (3rd Cir. 1963), and cases cited therein.

■ We realize that the Board in its review of an unfair labor practice hearing may reach opposite conclusions from its trial examiner based on the same credibility findings and evidence, provided the contrary inferences drawn are reasonable. Greco v. NLRB, 331 F.2d 165 (3rd Cir. 1964). However, such a cleavage of agency results leaves unaltered our criterion of review as defined in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951) which requires that the findings of the Board be supported by substantial evidence on the record as a whole. NLRB v. True-Line Metal Products Co., 324 F.2d 614 (6th Cir. 1963), cert. denied 377 U.S. 906, 84 S.Ct. 1167, 12 L.Ed.2d 177 (1964); NLRB v. Georgia Rug Mill, 308 F.2d 89 (5th Cir. 1962).

■ The Board considers the desired "laboratory conditions" of an election destroyed when the campaign misconduct attributable to one of the parties "reasonably tends to interfere with the voters' free choice." See NLRB v. Dallas City Packing Co., 251 F.2d 663, 666 (5th Cir. 1958). In addition, the timing and the proportionate impact of the objectionable activity on the outcome of the election weigh heavily.

■ When the first election was held on January 20, 1961, the Board adhered rigidly to the policy that it would not consider objections based on conduct which did not occur in the period between the execution of the consent election agreement and the holding of the election. American Molded Products Co., 134 NLRB 1446, 49 LRRM 1373 (1961); May Stern & Co., 119 NLRB 84, 41 LRRM 1010 (1957); Shoreline Enterprises, 114 NLRB 716, 37 LRRM 1048 (1955); F. W. Woolworth & Co., 109 NLRB 1446, 34 LRRM 1584 (1954). Since its decision in Goodyear Tire & Rubber Co., 138 NLRB 453, 51 LRRM 1070 (1962), the Board now considers the cut-off date for conduct affecting the outcome of the election in all cases to be the date the representation petition is filed.

After the Trial Examiner had discredited the testimony of three of the four witnesses who originally stated they had been threatened by the Company during the former critical period which controls here, the only evidence remaining to support the Board's conclusion that the results of the first election were coerced is the statement of one employee that one supervisor told him in private conversation that the plant would be moved if the Union won the election. To a degree the unlawful impression left by the remark of possible plant removal if organized was somewhat neutralized by a Company letter sent to all the employees during the week of the election. The permissible implication of the letter in this regard was that the Company might be forced to move again if it re-experienced high operating costs attributable to higher union wages.

■ The Board fortifies the asserted coercive effect on the election of the only credited threat by reliance on evidence of similar threats by Company representatives made prior to the critical pre-election period. Such evidence was incompetent under the Board's then prevailing standards. In Rockwell Mfg. Co., Kearney Div. v. NLRB, 330 F.2d 795 (7th Cir. 1964), cert. denied 379 U.S. 890, 85 S.Ct. 161, 13 L.Ed.2d 94 (1964), the Company urged that an election won by the union be set aside because of evidence that pro-union employees had threatened acts of violence against anti-union employees and that statements had been made by a union official to pro-union employees concerning the use of "paint bombs" in the context of a discussion on how to pressure employees into signing union authorization cards. Despite the seriousness of this evidence, the Board rejected the Company's offer of proof. The Court of Appeals upheld the ruling in refusing to set the election aside on grounds that the conduct complained of occurred prior to the signing of the consent election agreement and was inadmissible under the Board's pre-Goodyear Tire & Rubber Co. policy on objections.

Since the Board and at least one Circuit have ruled such pre-critical evidence without probative effect on the freedom of the election, it would be an abuse of the Board's discretion to permit it to arbitrarily retreat from this well-established policy here. This would be extremely unfair here in view of the fact that the Hearing Officer on objections to the first election prohibited the Company from cross-examining witnesses as to matters which occurred before execution of the consent election even for the limited purpose of impeachment.

■ Therefore, where the single threat apparently affected but one voter out of a unit of approximately ninety eligible voters, this could not possibly have affected the outcome of the first election. Such proof of isolated mis-

conduct during the critical period was unsubstantial to support the finding of the Board that it reasonably tended to interfere with a majority of the voters' free choice in rejecting the Union in the first election. Cf. Manning, Maxwell & Moore, Inc. v. NLRB, 324 F.2d 857 (5th Cir. 1963); compare West Texas Equipment Co., 142 NLRB No. 140, 53 LRRM 1249 (1963).

█ Inasmuch as the first election was valid, the Company was under no duty to recognize or bargain with the Union. Thus, the alleged violations of § 8(a) (5) and § 8(a) (1) stemming from the invalid second election within twelve months are without merit.

█ Since we have found that the Company was under no duty to recognize and bargain with the Union which did not validly represent a majority of its employees, the Company was not in violation of § 8(a) (5) in refusing to adjust their grievances with a Union representative. See 29 U.S.C.A. §§ 158 (a) (5) and 159(a). Consequently, the resultant walkouts by thirty-one employees, less than a majority of the proposed unit, were not caused by an unfair labor practice of the Company. Absent a labor violation by the Company, the Board cannot rely on § 10(c) of the Act, 29 U.S.C.A. § 160(c), as the basis for its reinstatement order of the discharged strikers. This section gives the Board affirmative, remedial power only when an unfair labor practice has been committed by authorizing its rectification through reinstatement of the affected employees who have not otherwise been discharged for cause. National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 257, 59 S.Ct. 490, 83 L.Ed. 627 (1939); NLRB v. Thayer Co., 213 F.2d 748, 752–753 (1st Cir. 1954), cert. denied 348 U.S. 883, 75 S.Ct. 123, 99 L.Ed. 694 (1954).

Nevertheless, a quite separate question remains as to whether the striking employees were engaged in a type of concerted activity within the protective mantle of § 7, participation in which the Company could not assert as a lawful ground for their discharge.

█ Of course, not all concerted activities are protected, and the right to strike as preserved in § 13 of the Taft-Hartley Amendment of 1947 to the Wagner Act (29 U.S.C.A. § 163) is subject to the limitations and qualifications fashioned by the Board and courts denying reinstatement to strikers who engage in strikes conducted in an unlawful manner or for an unlawful object. National Labor Relations Board v. Washington Aluminum Co., 370 U.S. 9, 17, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962); National Labor Relations Board v. Drivers Local Union, 362 U.S. 274, 281, 80 S.Ct. 706, 4 L.Ed.2d 710 (1960). Sitdown strikes marked with violence (National Labor Relations Board v. Fansteel Metallurgical Corp., supra), mutinous work stoppages by seamen on ship board (Southern S. S. Co. v. National Labor Relations Board, 316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1246 (1942)), strikes in which the employees distributed handbills defaming the quality of their employer's product (National Labor Relations Board v. Local Union No. 1229, International Brotherhood of Electrical Workers, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953)), and brief, unannounced walkouts or "quickie strikes" (International Union, U. A. W. A. F. of L. v. Wisconsin Employment Relations Board, 336 U.S. 245, 69 S.Ct. 516, 93 L.Ed. 651 (1949)) have all been condemned by the Supreme Court as unlawful, concerted activity outside the protection of § 7.

In Auto Workers v. Wis. Board, supra, commonly known as the Briggs-Stratton case, the Supreme Court held that where the employees were trying to put pressure on the company to accede to the demands of the union in negotiations for a new contract by calling twenty-six surprise work stoppages in a five month period, such concerted activity was neither a right nor a violation of federal law, and the State of Wisconsin could properly enjoin this coercive activity which

obviously had a disabling economic effect on the company.

And in National Labor Relations Board v. Insurance Agents, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960), the Supreme Court agreed, on the basis of its Briggs-Stratton rationalé, with the Board's argument there that a *total* strike is a concerted activity protected against employer interference by §§ 7 and 8(a) (1). But deliberate "slowdowns" and "walkouts" by the employees to exert pressure on the employer to accept the union's bargaining demands were unprotected concerted activities, and the employer was free to discharge the participating employees for their unlawful disloyal tactics. More recently, Mr. Justice Stewart observed in another context in American Shipbuilding Co. v. NLRB, 380 U.S. 300, 85 S.Ct. 955 (1965):

> "[T]here is nothing in the statute which would imply that the right to strike 'carries with it' the right exclusively to determine the timing and duration of all work stoppages. The right to strike as commonly understood is the right to cease work—nothing more."

The Trial Examiner relied on the following evidence in reaching his conclusion that the three walkouts of short duration did not constitute a genuine, protected protest against the Company's refusal to adjust grievances, but were planned attempts to unlawfully force the Company into recognizing the Union, and therefore fell under the Briggs-Stratton ban against such unprotected activity:

(1) The Union's letter admitting past concerted activity at the time the Company was complaining of production slowdowns and warning of future concerted activities by the employees unless the Company recognized the Union;

(2) A recommendation by the Union organizer at a union meeting that the employees "walk out for a day" to get the Company to curtail its issuance of disciplinary warning slips and layoffs or thereby obtain adjustment of these grievances with the Union;

(3) The employees' agreeing in advance to walk out for the remainder of the shift each time the Company refused to recognize the Union and adjust a grievance on a collective basis; and

(4) An employee's admission to his supervisor that he was not "putting out a day's work" until the Company recognized the Union plus other credited evidence of production slowdowns during this period.

The Board attempts to distinguish Briggs-Stratton as controlling here because the facts of that case show that each walkout was unannounced and some twenty-six occurred over a five month period. Whereas here, the Board asserts, there were only three walkouts, each precipitated by the Company's unfair labor practice, and each preceded by a demand on the Company which gave it an opportunity to obviate the work stoppages. For the reasons heretofore given, the Company committed no unfair labor practice in refusing to adjust grievances with the collective bargaining agent. Further, the fact that the Company was first informed of the planned walkouts and what it could do to avert them is unimportant. This was an empty gesture because the employees knew the Company was at the time exercising its only means to obtain review of the question of the validity of the Union's certification. See Boire v. Greyhound Corp., supra. To have bargained collectively with the employees' representative would have prejudiced litigation of the Company's contrary position. And finally, the repetitiousness of the intermittent walkouts within a short span of time was sufficient in the light of the Union's threat to continue the activity in the future so as not to distinguish the situation here from the Briggs-Stratton case. See NLRB v. Kohler Co., 220 F.2d 3, 11 (7th Cir. 1955).

We think the Board's finding that each of the walkouts was a separate, spontaneous, protected activity is contrary to both the law and substantial evidence on the record in its entirety. Therefore, the discharge of the thirty-

one strikers after several warnings from the Company to discontinue their unprotected concerted activities was not in violation of §§ 8(a) (3) and 8(a)(1).

The petition for enforcement is denied.