**CONREN, INC., d/b/a Great Scot Supermarket, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 15504.**

United States Court of Appeals Seventh Circuit.

Oct. 12, 1966.

Rehearing Denied Dec. 1, 1966. (En Banc)

Kiley, Circuit Judge, dissented in part.

Jack H. Rogers, Indianapolis, Ind., Roberts & Ryder, Indianapolis, Ind., of counsel, for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Clarice R. Feldman, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Allison W. Brown, Jr., Atty., N.L.R.B., Washington, D. C., for respondent.

Before CASTLE, KILEY and FAIRCHILD, Circuit Judges.

CASTLE, Circuit Judge.

This case is before the Court upon a petition to review and set aside, and upon the cross-petition of the National Labor Relations Board to enforce an order of the Board issued against the petitioner, Conren, Inc. The Board's decision and order are reported at 156 NLRB No. 43.

The Board found that Conren violated Section 8(a) (1), (2), (3) and (5) of the National Labor Relations Act, as amended, and by its order directs Conren to cease and desist from the unfair labor practices found. Affirmatively, the order requires, among other things,[1] that

---

1. Conren is also directed to disestablish and withhold recognition from an employee organization it was found to have instigated, aided and supported in violation of the Act; and to offer reinstatement to, and reimburse for lost earnings, certain employees it was found to have

Conren upon request bargain collectively with the Union.[2]

One of the principal issues this proceeding presents for our determination is whether the fact that the Union's demand for recognition and the commencement of contract negotiations, which Conren ignored, was made within less than one year—actually some nine months and sixteen days—after a valid Board conducted representation election in which the employees of the unit involved rejected both the Union and another labor organization (Teamsters, Chauffeurs, Warehousemen and Helpers Local Union 144) in favor of "no union" precluded the existence of any duty on the part of Conren to recognize and bargain with the Union.

From the record it appears that the Union's March 19, 1964 demand for recognition as the exclusive bargaining representative of the employee unit and for the commencement of bargaining negotiations was based on its possession on such date of authorization cards signed by 32 of the 53 employees in the unit as a result of a new organizational campaign commenced by the Union in March of 1964.

■ Conren contends the valid election held on June 7, 1963, only nine and one-half months previously, and which the Union lost, eliminated any duty on the part of Conren to bargain with the Union. Although Section 9(c) (3) of the Act[3] in its terminology expressly embraces only an "election" in placing the limitation it does on the Board's authority to direct the holding of a representation election, Conren reasons that the purpose of "furthering industrial stability" judicially recognized as one of the reasons why Congress so fixed the spacing of elections (Brooks v. N. L. R. B., 348 U.S. 96, 103, 75 S.Ct. 176, 99 L.Ed.

125) equally affords a basis for precluding a union which has lost a representation election from acquiring within the prescribed twelve-month period a status by other means, such as the signing of authorization cards by a majority of the employees involved, which places the employer under a duty to bargain with that union. This may well be. But the language and legislative history of Section 9(c) clearly indicate that Congress was aware of the alternative methods of establishing and determining union representative status, but that it concerned itself only with limiting the frequency of Board directed and conducted elections for such purpose when it enacted Section 9(c) (3). Congress not only established the policy but it also selected the means to aid in effectuating it. Petitioner's argument is misdirected. That Congress chose one method of furthering a prime objective of its legislative purpose does not afford a basis for this Court to select and impose an additional but different means. For this Court to so extend a similar post-election proscriptive period to a union's acquisition of representative status (with concomitant creation of employer duty to bargain with the Union upon demand) by means of authorization cards would in our opinion constitute an attempt by the Court to usurp a legislative prerogative.

Conren's reliance on N. L. R. B. v. Blades Mfg. Corp., 8 Cir., 344 F.2d 998, is misplaced. That case is inapposite. There, the Court found that there had been two elections within a one-year period, that the first election was valid and that the second, therefore, was invalid. Since the union's asserted representative status was based solely on the results of the second election it was held that the company had no duty to recognize or bargain with the union. The case did not involve a union demand for recog-

---

discriminatorily discharged for union activity and adherence.

**2.** Retail Store Employees Union, Local 550, Retail Clerks International Association, AFL-CIO.

**3.** 29 U.S.C.A. § 159(c) (3) which in pertinent part provides: "No election shall be directed in any bargaining unit or any subdivision within which in the preceding twelve-month period, a valid election shall have been held. * * * "

nition based on authorization cards, and the Court, therefore, had no occasion to consider the issue raised here of whether an employer is required to recognize and bargain with a union within a year following a valid election on the basis of a showing of authorization cards executed by a majority of the employees.

We have considered all of the other contentions advanced by the petitioner as justifying its refusal to recognize and bargain with the Union, and the additional contentions asserted by petitioner as demonstrating the existence of evidentiary and legal infirmities in the Board's findings and conclusions with respect to the other violations which are the subject of the Board's order. We perceive no useful purpose which would be served by extending this opinion to discuss these additional matters. From our examination of the record we are convinced that considered as a whole it contains substantial evidence, which together with reasonable inferences which may be drawn therefrom, supports the critical factual findings upon which the Board's ultimate conclusions rest, and we are of the opinion that those conclusions represent the application of correct legal criteria.

Conren's petition to set aside the Board's order is denied, and the Board's cross-petition for the enforcement of its order is granted. It is ordered that the Board's order be enforced and that a decree issue for that purpose.[4]

Enforcement ordered.

KILEY, Circuit Judge (dissenting in part).

I respectfully dissent in part. It is my opinion that Conren did not violate section 8(a)(5) by refusing to accede to the Union's bargaining demand on March 19, 1964, and that the authorization cards offered by the Union to show majority status were insufficient to put Conren under a duty to bargain because the Union had lost a valid election within the previous year, on June 7, 1963.

I cannot accept the majority view that under sections 8(a)(5) and 9(a) Conren had an obligation to recognize the Union. The view my opinion expresses serves the congressional purpose of the act, is not precluded by sections 9(a) and 9(c), is justified under the Board and court decisions and is within the spirit of the developing statutory law.

The majority relies upon the language and legislative history of section 9 as a clear indication that Congress was aware of alternative means of selection but limited the prohibition in section 9(c)(3) to elections in effectuating the congressional policy of industrial peace. It infers that, Congress having placed a limit on one means, this court is precluded from imposing a limit on additional, different means.

Under section 8(a)(5) an employer may not "refuse to bargain collectively with the representatives of his employees, subject to the provisions of section [9(a)]. * * *." Since section 9(a) speaks of representatives "designated [presumably by the Board after an election] or selected [presumably through less formal means] for the purposes of collective bargaining," it is evident, as the majority recognizes, that Congress did not intend elections under section 9(c) to be the only means by which a union could become the bargaining representative within the meaning of section 8(a)(5). UMW v. Arkansas Oak Flooring Co., 351 U.S. 62, 71–72, 76 S.Ct. 559, 100 L.Ed. 941 (1956); NLRB v. Larry Faul Oldsmobile Co., 316 F.2d 595, 596–597 (7th Cir. 1963). But it does not follow, as the Board and the majority indicate, that the Company's refusal to recognize the Union on the basis of authorization cards was an unfair labor practice under section 8(a)(5) where the Union had lost a valid election within the previous year.

---

4. A motion of the Board to strike from the caption of the case the names of parties against whom the order issued by the Board was not directed was taken with the case. That motion is hereby allowed. The caption appearing above reflects the deletions.

While section 9(a) is silent as to the appropriateness or relative merits of the various means of choosing a bargaining agent, the Board and the courts have, in certain factual situations, made some distinctions between elections and less formal means of selection for purposes of section 8(a) (5). For example, an employer may be ordered to bargain with a union without an election where he has sought to use the election process to gain time to dissipate the union's majority status. Joy Silk Mills, Inc. v. NLRB, 87 U.S.App.D.C. 360, 185 F.2d 732 (1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951). On the other hand, where an employer is presented with conflicting representation claims of rival unions, none of which are certified, it may not recognize any of them until an NLRB election has been held. Midwest Piping & Supply Co., 63 N.L.R.B. 1060, 1070 (1945); Barney Wilkerson Constr. Co., 145 N.L.R.B. 704, 705 (1964). The Board has imposed the *Midwest Piping* doctrine on an employer even where one of the competing unions had a majority of authorization cards. Novak Logging Co., 119 N.L.R.B. 1573, 1574–75 (1958). See also St. Louis Independent Packing Co. v. NLRB, 291 F.2d 700 (7th Cir. 1961).

In a related line of cases the Board and the courts have, after conflicting representation determinations, preferred election results over less formal means or vice versa, depending on the facts of the particular case. Where a union became defunct during its certification year, for instance, the Board has held that a subsequent showing of majority through authorization cards subjected the employer to a duty to bargain, despite the one-year certification rule. Rocky Mountain Phosphates, Inc., 138 N.L.R.B. 292, 295 (1962). In other circumstances, the courts have held that election results prevailed over subsequent less formal determinations of majority status. Brooks v. NLRB, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954); NLRB v. Blades Mfg. Corp., 344 F.2d 998, 1004 (8th Cir. 1965).

The rule in all of these decisions which have put a gloss on section 9(a) is that under certain circumstances only the most reliable means will be used in order to insure the employees' freedom of choice. The holdings in the *Brooks* and *Blades* cases illustrate the application of this principle in fact situations somewhat analogous to that before us.

In *Brooks* the Court sustained the union chosen in a valid election against a petition of an employee majority within a year of the election in affirming the Board's finding of an 8(a) (5) violation. It did not rest its holding upon the express 9(c) (3) limitation on the administrative powers of the Board. Instead the Court relied on the congressional policy of industrial peace reflected in the one-year spacing of 9(c) (3). In *Blades* the court nullified a second election (choosing the union) within a year of a valid election rejecting the union. This was by virtue of the prohibition in section 9(c) (3). But the holding of no 8 (a) (5) violation was based upon the lack of any duty upon the employer to recognize the union, even though the void election showed a majority favored the union. Presumably, the court recognized. 9(c) (3) as indicating the policy of industrial peace.

In *Brooks* the Supreme Court discussed the reasoning of the courts and Board with respect to the pre-Taft-Hartley "working rule" of the Board regarding the so-called "certification year." The Court summarized the reasoning, part of which is: that the binding effect of an election, which provides responsibility in the electorate and needed coherence in administration, is "equally relevant to healthy labor relations"; that the revocation of authority conferred or withheld in a "solemn and costly" election should occur by no less a solemn occasion; and that a petition or a public meeting influenced by mass psychology is not comparable to the privacy and independence of the voting booth.

These considerations are just as important, in my view, in the question be-

fore us, where the "solemn and costly" Board-conducted election resulted in a loss to the Union and in the less "solemn" expression an employee majority within a year demanded recognition on the basis of cards. The Wagner Act provided for certification only if the union won an election. The Taft-Hartley Act requires certification whether the union wins or loses. Thus the converse of the holding in *Brooks* ought to control this decision.

The decisions and statutory development provide the congressional principle and decisional rule which control my opinion. In this case the Union's soliciting of cards within a year of the valid election is as disruptive of industrial peace as a second election. In these circumstances, the rule of using the most reliable means (the valid election which the union lost) to insure employee freedom of choice should preclude the finding of an 8(a)(5) violation.

I would set aside the Board's finding of the 8(a)(5) violation.