NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SANITARY LAUNDRY, INC.,
Respondent.

No. 26–70.

United States Court of Appeals,
Tenth Circuit.

May 14, 1971.

William Wachter, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, John I. Taylor, Jr. and Carol Cole Kleinman, Washington, D. C., on the brief), for petitioner.

Leonard L. Pickering, Albuquerque, N. M., for respondent.

Before LEWIS, Chief Judge, and BREITENSTEIN and McWILLIAMS, Circuit Judges.

LEWIS, Chief Judge.

The National Labor Relations Board seeks enforcement of its order issued against respondent (Sanitary) and premised on a finding that Sanitary had refused to recognize and bargain with a duly certified union[1] in violation of sections 8(a) (5) and (1) of the National Labor Relations Act. See 172 N.L.R.B. No. 233. In its answer, Sanitary resists enforcement by way of attack upon the validity of the union's certification evolving after two company elections.

Pursuant to a stipulation for certification upon consent election an election was held at Sanitary on January 12, 1967. There were 155 eligible voters of whom 150 voted and, excluding two challenged ballots, the union was defeated 104 to 44. On January 18, the union filed objections to the election with the Regional Director and, after *ex parte* investigation, the Director issued his report and recommendations sustaining three of the objections and combining them as a single issue. Sanitary filed exceptions thereto and on review the Board (1) adopted the Regional Director's findings, conclusions and recommendations, (2) determined the employer's exceptions raised no material or substantial issues of fact or law, and (3) set aside the first election and directed a second to be held. The second election was held June 15, 1967 and of 142 eligible voters, 131 voted and cast 129 valid ballots; the Union won 73 to 56. Thereafter, on June 22, Sanitary filed objections to this election all of which were overruled by the Regional Director, again after *ex parte* investigation, as without merit. Refusing exceptions filed

1. Communications Workers of America (AFL–CIO).

by the employer, the Board adopted the findings, conclusions and recommendations of the Regional Director and found no issues of fact or law raised by the exceptions which would warrant reversal. The employer filed three motions for reconsideration, all of which were denied. The union was then certified.

Although this case is disturbing to us in some regards it must have occasioned an equally hesitant moment or two to Board counsel in its presentation as a simple summation of the Board's rulings will indicate. In setting aside the first election the Board concluded as a matter of law that a series of campaign communications sent by Sanitary to its employees, when viewed in totality but not singly, created a coercive atmosphere that destroyed the necessary standard of the election by giving the impression that unionism would inevitably result in strikes and economic depression. An offer by Sanitary to prove that such conclusion was not factually justified was rejected by the Board. Since the union was rejected at this election by a vote of 104 to 44, the Board must have considered the coercive effect of Sanitary's conduct to be unavoidably great per se.

In upholding the second election the Board concluded, again as a matter of law, that statements by union campaigners that employees who voted against the union would lose their jobs did not have such coercive effect as to warrant setting the election aside. This election was won by the union by seventeen votes, a result that could easily be influenced by effective coercion. And, in attempting to support this aspect of the Board's decision its counsel relies, in part, on the communications of Sanitary made during the first election to negative the impact of the union's conduct in the second election.

■ The law applicable to review of Board action in setting aside an election has recently been set forth by this court in Excelsior Laundry v. NLRB, 10 Cir.,

409 F.2d 70, a case involving a competitor of Sanitary's, pending during the instant dispute, and to which the parties made reference during the election campaigns.[2] The Board has the broad duty of providing election procedures and safeguards for elections and a wide discretion in determining when conduct did or did not jeopardize the untrammeled expression of employee freedom of choice. However, the Board's discretion is not without limitation and when conduct is deemed coercive through the indirection of inferential conclusion of a per se violation this court will examine the record as a whole with care. Certain it is that stability in labor relations is hindered by the prolonged continuation of turmoil necessarily present during election campaigns.

■ The Director's recommendation that the first election be set aside was limited to a finding that letters sent by Sanitary during the pre-election campaign exceeded permissible bounds in that they suggested the inevitability of a strike and implied that employee job security would be threatened if the union was voted in. The literature relied on by the Director for his recommendation, in addition to the letters, was a cartoon and a leaflet containing a copy of a newspaper article about a strike at a Texas laundry (not involving the CWA) where the strikers could not be reinstated at their jobs or receive unemployment compensation. The leaflet was highlighted with Sanitary's comments emphasizing the consequences of the strike.

Some of the language of the letters relied on by the Director and here pertinent is as follows:

*Letter 1  If this union is voted in,* then comes negotiations and the possibility of strikes, along with being obligated to pay the union dues, initiation fees, assessments, union fines, etc. *It is up to you* to take a stand, talk to your fellow employees and vote.

2. The writer dissented in Excelsior but only as to the application of particular facts to accepted principles.

We know the union has, and will continue, to make all sorts of wild promises to try to persuade you to vote for it. Simply bear in mind that they can promise anything, but they can't deliver.

All they can do is ask, and if turned down, all they can do is *strike*. *Strikes mean no pay checks*, no unemployment checks even, and many times jobs lost forever. Between now and the election we will try to present some of our thinking on this union question.

*Letter 2* In regard to changes in the work force, we want to point out that the union has no jurisdiction in this area, and they cannot promise you job security. Actually all the union can do is ask, and, if turned down—Go on strike.

Don't join [another laundry's] employees in being the Union's Guinea Pig.

Vote *no* to promises Union bosses can't keep.

*Letter 3* It has been brought to our attention that the Union bosses have threatened to fine anyone not signing a card $70.00, and that they may lose their jobs, too.

The Union *cannot* do anything to you because of the way you vote in the election. The election is a secret ballot and no one will know how anyone has voted. Also, the Union has no power whatever to fine anyone and the management promises to protect everyone against any such threats.

Why put up with these needless threats! Vote *no* on January 12.

*Letter 4*

IF you don't want DUES,
FINES and ASSESS-
MENTS .................VOTE NO
IF you don't want CON-
STANT PAYCHECK
UNCERTAINTY .........VOTE NO
IF you don't want to pay
for what you ALREADY
HAVE ..................VOTE NO

IF you have signed a
card, you can now .........VOTE NO
IF you want to continue
STEADY WORK WITH-
OUT STRIKES ...........VOTE NO
IF you don't want the un-
ion itself with its tactics
to jeopardize the Compa-
ny and thereby your job,
as it has in every similar
shop in town that they
have been in to our knowl-
ledge ....................VOTE NO

*Letter 5* The letter is a general discussion of Sanitary's favorable wage scale and fringe benefits in comparison to those of Excelsior during that company's period of labor unrest.

The letters were mailed to the employees between December 30 and January 7. The cartoon depicted, *inter alia*, employees walking a picket line and an empty meal table of a worker captioned "Bailey [the union agent] and his promises!" It is undisputed the cartoon was distributed within the 24 hours immediately preceding the election. The Director determined that the cartoon reinforced the suggestion of a strike already repeatedly manifested in the subject letters.

The Director determined the leaflet viewed alone did not suggest the inevitability of a strike but when viewed in the context of all the other literature "contributed to the impression * * * that a strike would inevitably follow" should the union win the election. The leaflet was distributed between December 30 and January 7, and was also posted near Sanitary's time clock.

Although the Board has a duty to assure fair elections it must recognize

a congressional intent to encourage free debate on issues dividing labor and management. And * * * cases involving speech are to be considered "against the background of a profound * * * commitment to the principle that debate * * * should be uninhibited, robust, and wide-open * *." (Footnote omitted.)

Linn v. United Plant Guard Workers, 383 U.S. 53 at 62, 86 S.Ct. 657 at 663, 15 L.Ed.2d 582, citing New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686.

The employer's pre-election campaign literature certainly did not violate the principle "that debate * * * should be uninhibited, robust, and wide-open." Linn, supra. Nor did Sanitary set forth any reckless or actual untruth. The conclusion that Sanitary's literature portrayed the *inevitability* of a strike would seem to be premised upon that company's emphatic repetition that a strike is the union's chief economic weapon and the immediate economic detriments inherent in a strike. Emphasis and repetition of a valid argument is fair campaigning and the Board has recognized the basic validity of Sanitary's primary tactics. *See e. g.,* Thomas Products Co., 167 N.L.R.B. No. 106, ¶ 21,810:

> In outlining the * * * disadvantages of unionization, an employer is not prohibited from pointing out that the strike is a union's chief economic lever, and that strike action might entail certain consequences.

There was not here, as in *Thomas Products*, any indication by the employer that there would be a refusal to bargain in good faith, a plant shutdown, a decrease in employee benefits because of contract negotiations, and an inevitable strike. For campaigns broader in scope and more "robust and wide-open" which have been approved see NLRB v. TRW—Semiconductors, Inc., 9 Cir., 385 F.2d 753, and American Greetings Corp., 146 N.L.R.B. No. 157, ¶ 13,102. *See* Elgin Butler Brick Co., 147 N.L.R.B. No. 170, ¶ 13,299, for a campaign similar to the subject one.

We conclude that the Board was not justified in setting aside the first election but in reaching that conclusion we do not limit our review to a consideration of the incidents of the first election viewed in isolation. Our review is of the record as a whole to determine whether the Board order should be enforced. And in this regard we cannot attribute to the Board a discretion so flexible as to justify its first action when laid side by side with its subsequent determination that the direct and coercive threats by union campaigners in the second election were purged as ineffectual because Sanitary had properly educated its employees to the fact that such threats could not be carried out.

The Board's discretion, though indeed broad, must be exercised with consistency in order to further the purposes of the Act.

Enforcement is denied.