456 F.2d 298
 79 L.R.R.M. (BNA) 2682, 67 Lab.Cas. P 12,469
 WILKINSON MANUFACTURING COMPANY, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
UNITED STEELWORKERS OF AMERICA, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, and Wilkinson
Manufacturing Company, Intervenor.
 Nos. 71-1021, 71-1030.
 United States Court of Appeals,
Eighth Circuit.
 March 1, 1972.
 
 Charles E. Sykes, Lincoln, Neb., for petitioner Wilkinson Mfg. Co.
 William A. Jolley, Kansas City, Mo., for petitioner United Steelworkers.
 Howard C. Hay, Atty., N. L. R. B., Washington, D. C., for respondent.
 Before VAN OOSTERHOUT, BRIGHT and STEPHENSON, Circuit Judges.
 BRIGHT, Circuit Judge.
 
 
 1
 This labor-management controversy stems from the efforts of United Steelworkers of America, AFL-CIO (the Union), to organize production and maintenance workers at the Wilkinson Manufacturing Company (the Company) located in Fort Calhoun, Nebraska. In a representation election held on June 6, 1967, the employees rejected the Union by a substantial margin. The Union filed exceptions to the election results, challenging the Company's campaign tactics. Thereupon, the Board ordered a rerun election. The Union won the second election, held on May 2, 1968, by six votes. The Company filed objections to the Union's campaign tactics preceding the second election, but the Board rejected the objections and, on October 16, 1969, certified the Union as the exclusive bargaining representative. Subsequently, the Company refused to bargain with the Union, and the employees responded by engaging in minor strike activities. The Union also filed unfair labor practice charges against the Company for refusing to bargain and for disciplining some, and firing other, employees. After a hearing, the Board found the Company guilty of unfair labor practices as follows:
 
 
 2
 (1) Violation of Sec. 8(a) (5) and (1) (29 U.S.C. Sec. 158(a) (5) and (1)) of the Act in refusing to bargain with the Union, in failing to supply information to the Union for bargaining purposes, and in unilaterally altering wages, employment benefits, and rules governing employee absenteeism.
 
 
 3
 (2) Violation of Sec. 8(a) (3) and (1) (29 U.S.C. Sec. 158(a) (3) and (1)) of the Act by refusing to reinstate sixteen striking employees following their unconditional offer to return to work, and for transferring one employee to a less desirable job because of her union activity.
 
 
 4
 (3) Violation of Sec. 8(a) (1) (29 U.S.C. Sec. 158(a) (1)) of the Act by threats to, and interrogation of, employees who had engaged in a one hour work stoppage to protest the Company's refusal to recognize the Union.
 
 
 5
 The Board ordered the Company to bargain with the Union upon request, to reinstate and "make whole" employees affected by Sec. 8(a) (3) violations, and to cease and desist in further unfair labor practices.
 
 
 6
 The Union had requested additional relief in the following form: that the employees be reimbursed for those economic benefits which they would have received but for the Company's refusal to bargain with the Union; and that the Union be reimbursed for litigation expenses and the loss of Union dues attributable to the Company's refusal to bargain. The Board denied this relief.
 
 
 7
 The Company here petitions for review of the Board's order and the Board cross-applies for enforcement (No. 71-1021). The Union petitions for review of the Board's denial of the claim for additional relief (No. 71-1030). Upon our review, we reject the bargaining order as being improvidently granted. We do not reach the merits of the Union's claim for additional relief.
 
 I.
 
 8
 We turn initially to the Company's principal contention that the Board erred in certifying the Union as the exclusive bargaining representative. The subsequent bargaining order is premised upon the validity of this certification. The Company's petition for our review is the proper method for challenging the underlying orders of the Board which annulled the first election and certified the Union on the basis of the second election. Board actions in a representation controversy, such as those under consideration here, cannot be judicially reviewed until an order, such as a bargaining order, is issued requiring the employer to do something predicated upon the results of an election. See, e. g., Orchard Corp. of America v. NLRB, 408 F.2d 341, 342 n.1 (8th Cir. 1969); NLRB v. Blades Manufacturing Corp., 344 F.2d 998, 1002 (8th Cir. 1965); Daniel Construction Co. v. NLRB, 341 F.2d 805, 809 (4th Cir. 1965). The company contends that the Board abused its discretion by upholding the Union's challenge to the first election, and ordering a rerun election. Moreover, it claims that the Board compounded its error by refusing to set aside the Union victory in the second election.
 
 
 9
 The employees rejected the Union in the first election by a vote of 113 to 84. The Regional Director, after an investigation but without any formal hearing sustained the Union challenge to this election on three grounds: (1) that the Company had used a supervisory employee as an election observer, (2) that the Company improperly influenced the election results by promising benefits to the employees should they reject the Union,[1] and (3) that the Company had misrepresented the law by blaming the Union for the failure of the Company to grant any unilateral increase in employee benefits.[2]
 
 
 10
 The rerun election, ordered by the Board, resulted in a Union victory by a vote of 102 to 96. The Company excepted to the results of this election, claiming that the Union was guilty of coercive and threatening conduct during the pre-election campaign. The Board referred these charges to a hearing examiner, who, although recommending that the election results be sustained, found that a Union field representative had stated to an anti-union employee, Gammel, that if the Union got in it "had ways" of getting rid of nonunion employees. This statement was made at a meeting open to all employees about two months before the election. At a similar meeting held during the same general time period, another Union officer, during an argument with another employee who had expressed anti-union sentiments, told this employee to "shut up" and sit down or she would lose her job.
 
 
 11
 Although the hearing examiner felt that these statements by the Union carried threatening overtones, he concluded that they had not interfered with the employees' freedom of choice since the first statement mentioned above could imply merely that the Union could accommodate itself to the presence of nonunion employees working for the Company, and the second statement was apparently spoken out of irritation with a heckler, and represented only a conditional threat, to be carried out only if the employee "did not sit down and keep quiet." The Board adopted the examiner's assessment of these incidents, as well as his conclusion that they did not taint the second election.
 
 
 12
 In evaluating the Company's claim that the Board committed error in its evaluation of both elections, we are mindful that Congress has entrusted the Board with broad discretion in conducting representation elections. E. g., NLRB v. A. J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 91 L.Ed. 322 (1946); NLRB v. Waterman Steamship Corp., 309 U.S. 206, 226, 60 S.Ct. 493, 84 L.Ed. 704 (1940); Marine Welding & Repair Works, Inc. v. NLRB, 439 F.2d 395, 398 (8th Cir. 1971); NLRB v. Blades Manufacturing Corp., supra, 344 F.2d at 1002. Moreover, we recognize that our power of judicial review in this area is limited to ascertaining the reasonableness of the Board's decision. NLRB v. Golden Age Beverage Co., 415 F.2d 26, 29 (5th Cir. 1969); see, e. g., Macomb Pottery Co. v. NLRB, 376 F.2d 450, 452-55 (7th Cir. 1967); NLRB v. Allen Manufacturing Co., Inc., 364 F.2d 814, 816 (6th Cir. 1966); Blades, supra, 344 F.2d at 1002. Certainly, considering the prolonged continuation of turmoil usually present during election campaigns, the results of representation elections should not be set aside lightly. See, e. g., Linn v. United Plant Guard Workers of America, Local 114, 383 U.S. 53, 60-61, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966); Baumritter Corp. v. NLRB, 386 F.2d 117, 120 (1st Cir. 1967); Blades, supra, 344 F.2d at 1002. Election results should be set aside only when the conduct in question has created an atmosphere of tension or coercion such as to preclude employees from exercising a free choice. NLRB v. Golden Age Beverage Co., supra, 415 F.2d at 32; NLRB v. Zelrich Co., 344 F.2d 1011, 1015 (5th Cir. 1965); cf. Arbie Mineral Feed Co. v. NLRB, 438 F.2d 940, 943-944 (8th Cir. 1971).
 
 
 13
 With regard to the first election, we agree that the speech delivered by the Company superintendent four days prior to the election contained remarks which may have been understood by the employees to promise a wage increase conditioned upon a rejection of the Union. See NLRB v. Dixisteel Buildings, Inc., 445 F.2d 1260, 1263-1264 (8th Cir. 1971). The Company concedes, as found by the Board, that the statement in the questioned speech, blaming the Union for the lack of wage increases or other benefits during the organizational campaign, technically misrepresented the law, since an employer may increase wages or other benefits during an organizational campaign if its action is without any purpose of impinging upon the employees' freedom of choice in selecting or rejecting the Union.[3] Additionally, on our review we find substantial evidence supporting the Regional Director's determination that the Company wrongfully used a supervisory employee as an election observer.[4] The Board policy generally discourages the use of supervisors as election observers, to avoid "the likelihood that their presence at the polls may unduly influence employees to cast a no-union vote." Plant City Welding & Tank Co., 119 NLRB 131, 132 (1957). See Ray Whitfield Ford, Inc., 169 NLRB 484, 486 n.6 (1968); Arthur J. Wiltse, d/b/a The Ann Arbor Press, 88 NLRB 391, 392-93 (1950). Accordingly, we conclude that it was within the broad discretion afforded the Board to set aside the results of the first election and order that a second election be held.
 
 
 14
 We now turn to an examination of the allegedly coercive statements made by Union leaders prior to the second election. As we have noted, these statements were made in the presence of employees attending Union-sponsored meetings. The record shows that the statement ascribed to the Union official concerning "getting rid" of nonunion employees, thereafter provoked extensive discussion among the employees. Although this and the second incident, already described, occurred about two months prior to the rerun election, this time interval would not necessarily diminish the prejudicial effect of such statements where considerable controversy has thereby been generated among the employees.
 
 
 15
 When we compare the Board's response to the Company's actions preceding the first election with the response to the Union's actions prior to the second election, we are left with the distinct impression that less than an even hand was employed in dealing with the two situations. The Company speech before the first election was, at most, implicitly prejudicial as contrasted with the direct and explicit threats of job loss made by the Union prior to the second election. The Company's speech failed to elicit enough controversy to prompt a Union objection or reply, while the threat to employee Gammel by the Union precipitated considerable discussion among the employees and an objection by the Company. Finally, the substantial discrepancy in the respective vote margins of the two elections further betrays the application of an uneven hand. The Union was rejected by 29 votes in the first election and won the second election by only 6 votes. Yet the Board directed a rerun for the first, but not the second, election. It would seem that the Board should have been more sensitive to prejudicial compaign tactics leading up to the second election, where the successful intimidation of only three employees would have reversed the outcome. See NLRB v. Sanitary Laundry, Inc., 441 F.2d 1368, 1369 (10th Cir. 1971).
 
 
 16
 Overall, when the record underlying the Board's order in the first election is laid side-by-side with the record in the second election in which the Board reached a contrary result as concerns the validity of the election, we find a manifest inconsistency present. We cannot attribute to the Board a discretion so flexible as to accommodate this inconsistency based on the overall record in this case. See Sanitary Laundry, Inc., supra, 441 F.2d at 1371.
 
 
 17
 In Sanitary Laundry, the Tenth Circuit considered similar discrepancies in the Board's decisions regarding two representation elections. There the Board had set aside the first election on the basis of its conclusion that the employer's pre-election statements in letters to employees exceeded permissible bounds. There the Board had sustained the second election, which the Union won despite statements by the Union similar in context to those in question here, that employees who voted against the Union would lose their jobs. Thereafter, the employer refused to bargain with the Union and upon complaint, the Board issued a bargaining order. In refusing enforcement of that order the Tenth Circuit noted that "[t]he Board's discretion, though indeed broad, must be exercised with consistency in order to further the purposes of the Act." [441 F.2d at 1371]. We follow a similar approach here and conclude that the Board's inconsistent handling of the two elections in this case cannot be permitted to stand.
 
 
 18
 While in Sanitary Laundry the court sustained the first election, in which the employees had rejected the Union, we think that the better approach here is to sustain the Company's challenge to the second election and thereby permit the Board, in its discretion, to direct an additional election to determine whether the Union now represents a majority of the production and maintenance employees of the Company. Cf. NLRB v. Sayers Printing Co., 453 F.2d 810, 818 (8th Cir. 1971).
 
 II.
 
 19
 On November 1, 1969, following the second election, the Company instituted a new and more stringent rule governing absenteeism. Thereafter, strictly interpreting and enforcing these new rules, the Company fired a total of seven employees in November and December of 1969 for violating the new rules. The Board determined that this unilateral change in working conditions violated Sec. 8(a) (5), and it directed the Company to reinstate the discharged employees and make them whole for any loss they may have suffered. Since we have refused to sustain the bargaining order in this case, we will not enforce this remedy for the alleged violation of Sec. 8(a) (5).
 
 III.
 
 20
 The Board determined that the Company violated Sec. 8(a) (1) by threatening workers upon their return to the plant after a one hour work stoppage on November 12, 1969, in which employees protested the Company's refusal to recognize and bargain with the Union. The record shows that these employees had engaged in concerted activities in this instance without employing any unlawful means. Contrary to contentions of the Company, the record does not show this work stoppage to have been unlawful as partial, intermittent, or recurrent. This work stoppage was thus protected by Sec. 7 (29 U.S.C. Sec. 157) of the Act. Accordingly, we sustain the Board's determination that the employer's threats following the November 12 work stoppage constituted an unfair labor practice which tended to coerce and interfere with the right of its employees to engage in protected activities for the purpose of collective bargaining. See First National Bank of Omaha v. NLRB, 413 F.2d 921, 923-924 (8th Cir. 1969); NLRB v. Plastilite Corp., 375 F.2d 343, 347, 349-350 (8th Cir. 1967).
 
 IV.
 
 21
 Finally, we need to review the status of the sixteen employees who were not reinstated by the Company following a three day strike by some forty employees in January of 1970. The Board determined that these individuals were unfair labor practice strikers, and, by unconditionally requesting reinstatement, were entitled to be restored to their pre-strike positions with the Company. Since we have held that the Union was not validly elected as the employees' bargaining representative, we must characterize these sixteen employees as economic strikers. As economic strikers, they were not entitled to reinstatement if their former positions and all equivalent positions had been filled by permanent replacements. NLRB v. MacKay Radio & Telegraph Co., 304 U.S. 333, 345-356, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). Upon application, however, they were entitled to reinstatement as positions for which they were qualified became available, the burden being on the employer to show that its refusal to reinstate rested upon "legitimate and substantial business justifications." NLRB v. Fleetwood Trailer Co., Inc., 389 U.S. 375, 378-79, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967); NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 34, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967); Little Rock Airmotive, Inc. v. NLRB, 455 F.2d 163 (8th Cir. 1972).
 
 
 22
 The Board in the instant case approved the trial examiner's findings that "[t]here is no evidence, indeed Respondent [employer] does not contend, that [the employees'] prestrike jobs were no longer in existence * * *." In addition, the Company offers no justification in its brief for its refusal to reinstate these employees. Accordingly, we think it immaterial on this record whether the Board classified the sixteen employees in question as unfair labor practice strikers rather than economic strikers. They were entitled to reinstatement in either event, and the Company's failure to reinstate them immediately to their prior positions constituted an unfair labor practice in violation of Sec. 8(a) (3) and (1).[5] See Little Rock Airmotive, Inc. v. NLRB, supra, 455 F.2d at 167-68 (8th Cir. 1972).
 
 
 23
 In First National Bank of Omaha v. NLRB, 413 F.2d 921 (8th Cir. 1969), Judge Heaney made the following comment which we deem appropriate here:
 
 
 24
 If the [employer] had acted immediately after the walkout to replace the striking employees with other employees, it could have done so legally. The employees were 'economic strikers' and entitled to reinstatement only if their jobs were open when they returned to work. Here, the employees offered to come back to work before their jobs were filled and the [employer] was obligated to take them back. [Id. at 925]
 
 V.
 
 25
 Since we refuse to sustain the bargaining order, we do not reach the merits of the Union's demand for additional relief. We, therefore, express no opinion as to the Board's authority in a proper case to grant such further "make whole" relief to employees or a union for losses attributable to the employer's refusal to bargain in violation of Sec. 8(a) (5) of the Act.
 
 VI.
 
 26
 We grant enforcement of the Board's order only in part as noted herein. No costs are awarded.
 
 
 
 [1]
 The plant superintendent's speech given four days prior to the election contained the following statement:
 * * * I don't expect any of you to be making less than $70.00 per week one year from now. The rest of you who are already paid higher can expect to do better also * * *.
 
 
 [2]
 The plant superintendent's speech continued with the following statement:
 * * * Since the union filed that petition a month or so ago management's hand [sic] have been tied-management could not unilaterally grant another bonus, give you another paid holiday or other such benefits. That's the law. For anything along that line that you didn't get, you can blame or thank the labor union.
 
 
 [3]
 See, e. g., St. Louis Car Division General Steel Industries, Inc. v. NLRB, 439 F.2d 1145, 1149 (8th Cir. 1971); IUEW, Local 806 v. NLRB, 140 U.S.App.D.C. 199, 434 F.2d 473, 476-477 (1970); NLRB v. Douglas & Lomason Co., 333 F.2d 510, 514 (8th Cir. 1964) (dictum); NLRB v. W. T. Grant Co., 208 F.2d 710, 712 (4th Cir. 1953)
 With deference to the Board's view on this matter, we also note that the statement in the speech is not completely without foundation. Certainly the applicable law does require close scrutiny of any unilateral benefit granted by an employer during a union's organizational campaign. As explained by the Supreme Court in NLRB v. Exchange Parts Co., 375 U.S. 405, 409-410, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964):
 The danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove. Employees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged.
 * * *
 * * * It is true, as the court below pointed out, that in most cases of this kind the increase in benefits could be regarded as 'one part of an overall program of interference and restraint by the employer[.]' * * * [citing 304 F.2d at 372] (emphasis added)
 See, e. g., NLRB v. Big Three Industrial Gas & Equipment Co., 441 F.2d 774 (5th Cir. 1971); NLRB v. Gotham Industries, Inc., 406 F.2d 1306, 1310 (1st Cir. 1969); NLRB v. Pyne Molding Corp., 226 F.2d 818, 820-21 (2d Cir. 1955); Indiana Metal Products Corp. v. NLRB, 202 F.2d 613, 620 (7th Cir. 1953).
 
 
 [4]
 The Company has objected to, and assigned as error, the refusal of the Board to order a hearing on the Union's objections to the first election. The briefs and record show no material dispute over the facts, but merely inferences to be drawn therefrom. Under these circumstances, no hearing was required. NLRB v. DIT-MCO, Inc., 428 F.2d 775, 778 (8th Cir. 1970); Intertype Co. v. NLRB, 401 F.2d 41, 44 (4th Cir. 1968), cert. denied, 393 U.S. 1049, 89 S.Ct. 686, 21 L.Ed.2d 691 (1969)
 
 
 [5]
 We have not discussed the Company's Sec. 8(a) (3) violation relating to the transfer of one employee to a less desirable position. It is our understanding from the brief of petitioner Wilkinson that it does not contest this determination