**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MacCOLLUM PAPER COMPANY, Inc., Respondent.**

**No. 15572.**

United States Court of Appeals Seventh Circuit.

Oct. 18, 1966.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Glen M. Bendixsen, Atty., N.L. R.B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, for petitioner.

Richard P. Tinkham, Jr., Indianapolis, Ind., for respondent. Briggs, Berner, Sommer & Tinkham, Indianapolis, Ind., of counsel.

Before SWYGERT, FAIRCHILD and CUMMINGS, Circuit Judges.

PER CURIAM.

Under Section 10(e) of the National Labor Relations Act (29 U.S.C. Sec. 160 (e)), the National Labor Relations Board seeks enforcement of its order granting relief against MacCollum Paper Company, which is engaged in selling paper products at wholesale in Indianapolis, Indiana.

In December 1964, the International Brotherhood of Teamsters filed a charge against the Company resulting in the issuance of a complaint alleging the commission of various unfair labor practices by the Company. After the close of a hearing in Indianapolis, the trial examiner found that the Company violated Section 8(a) (1) (29 U.S.C. Sec. 158(a) (1)) of the Act by interfering with, restraining and coercing its employees in the exercise of their rights under the Act. The examiner also found that the Company refused to bargain with the Union in violation of Section 8(a) (5) and (1) (29 U.S.C. Sec. 158(a) (5) and (1)). The Labor Board adopted the examiner's findings.

In 1955, the Company and the Union entered into a collective bargaining agreement, containing a union-shop clause, to remain in effect until December 14, 1964. During the relevant period the agreement covered a unit comprised of two employees. One of the two employees was Robert C. Farmer, who had authorized the Company to check off his dues in 1960. The other employee, Thomas Dickson, signed a union checkoff authorization on September 24, 1964.

Dickson was employed about August 24, 1964, as a paper cutter. About a week before Dickson was employed, he was interviewed by the Company Vice President, George Milhon. At that time, they discussed Dickson's attitude about joining the Union. Dickson stated that he had pros and cons about the Union. Milhon told Dickson that he would have to join the Union upon working for the Company, even though Milhon wished it could be otherwise. Dickson replied that he would do so if that was the present policy of the Company. During this interview, Milhon also told Dickson that the Union contract would expire in December, when he would like to make a change. He said that a Union was not good for a small-sized Company like his.

On September 15th, the Company received a letter from the Union offering to meet and confer with the Company for the purpose of negotiating a new collective bargaining agreement. On November 16th, Milhon replied to the Union's letter, declining the offer on the ground that the Company believed the Union no longer represented a majority of the em-

ployees in the bargaining unit. On December 29th, the Union sent another letter to the Company again requesting a meeting for contractual negotiations, but the Company did not reply.

About the middle of October, Dickson and his wife were invited to an evening meeting in Milhon's home. Milhon asked Dickson what his present feelings were with respect to the Union, and Dickson replied that he had not yet come to any conclusions. Milhon said that under the Union contract, he did not see how the Company could carry on and still be competitive, and that there was a possibility of closing down. Milhon also was critical of Mr. James Hoffa of the Union. Milhon added that the Company would like its own truck and driver but could not under the Union contract. He said that the Company wished to establish its own insurance plan because the Union insurance was inadequate. Milhon also asked Dickson whether he would sign a decertification petition. Dickson said he would have to think about it.

At this meeting Milhon told Mrs. Dickson that he would see to it that Dickson got back all the money he had paid the Union. Milhon said there was room for advancement for Dickson in the Company, and that he had high potential for advancement. Before parting, Milhon told Dickson that he was "going to make a change as far as the Union is concerned" regardless of Dickson's decision about the Union.

In the latter half of November, Dickson, Farmer and Milhon attended a meeting in Company President MacCollum's office. Milhon complained that under the Union contract the Company was a divided one. Farmer said he favored the Union because of his pension, and MacCollum said that he would let Farmer know what he could do about the pension. Milhon again said that the Company could not obtain a truck-driver because of the Union situation, and that the Company could not afford the Union's demands and still be competitive. He also complained that because of the Union

contract, he could not deal personally with his employees.

On December 7th, Dickson, Farmer and Milhon again met with President MacCollum. MacCollum handed the two employees sheets containing their current vages and wages and benefits proposed by the Company. Milhon said that the Company would have to close shop if there were higher demands. MacCollum explained that both employees would take home more money under the Company's proposals, for they would not have to pay Union dues. Upon Farmer's complaint about his pension, MacCollum said that the Company was thinking of eventually inaugurating a pension plan. MacCollum mentioned that Farmer's pension plan under the Teamsters' contract denied other Company employees this type of coverage, causing hard feelings.

The Board approved the trial examiner's conclusion that the Company violated Section 8(a) (1) of the Act by interrogating Dickson about his Union sympathies, threatening to close down if the Union continued to represent this unit, promising Dickson and Farmer benefits and to refund Dickson's contributions to the Union, and trying to persuade Dickson to sign a decertification petition.

The Board also agreed with the examiner that the Company violated Section 8(a) (5) and (1) of the Act by refusing to bargain with the Union after September 24th, when the Union represented a majority of the employees in the unit.

The Board's order required the Company to cease and desist from its unfair labor practices and from interfering with the exercise of its employees' statutory rights. 155 NLRB No. 91. The Board also directed the Company to bargain with the Union and to post appropriate notices at its plant.

█ As in National Labor Relations Board v. John S. Swift Company, 277 F.2d 641, 646 (7th Cir. 1960), this record discloses no previous anti-union background of the Company. In fact, at the

pre-employment interview, Vice President Milhon told Dickson that he would have to join the Union. No anti-Union threats were expressed, nor did Milhon state that Dickson would not be employed if he joined the Union, although here and in *Swift* the Company engaged in anti-Union activities subsequent to the initial interview. In this setting, under the *Swift* case, the evidence does not support the Board's conclusion that Milhon's pre-employment interrogation of Dickson violated Section 8(a) (1) of the Act.

 The remaining findings of the Board are supported by substantial evidence and are therefore conclusive under Section 10(e) of the Act (29 U.S.C. Sec. 160(e)). Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; Revere Camera Co. v. National Labor Relations Board, 304 F.2d 162 (7th Cir. 1962).

The Company has filed a motion for leave to adduce additional evidence to show that in 1966 Dickson was discharged (the Labor Board later dismissing a charge based thereon) and that Farmer left its employ. For the purposes of the appeal, we shall assume that Dickson and Farmer are no longer in the Company's employ. The present status of the unit is material only as to the matter of compliance with our decree. National Labor Relations Board v. Haspel, 228 F.2d 155, 156 (2nd Cir. 1955). The Board is entitled to have the resumption of unfair practices barred by an enforcement decree. Respondents, guilty of unfair labor practices may not "play hide-and-seek" with the Board. National Labor Relations Board v. Mexia Textile Mills, 339 U.S. 563, 568, 569, 70 S.Ct. 833 94 L.Ed. 1067. Upon enforcement of its order in the compliance proceedings, the Labor Board will of course consider any change of circumstances. National Labor Relations Board v. Acme Mattress Co., 192 F.2d 524, 528 (7th Cir. 1951).

Enforcement of the Board's order is denied insofar as it relates to any violation of the Act predicated upon the pre-employment interrogation of Dickson. Thus paragraph 1(b) of the Board's order* shall not be enforced in that particular respect. In other respects, the Board's order (including paragraph 1(b)) should be enforced. Respondent's motion for leave to adduce additional evidence is denied.

Enforced in part and denied in part.

---

* Paragraph 1(b) of the Board's order provides that the respondent shall cease and desist from "Interrogating employees concerning their union membership, activities or sympathies in a manner constituting interference, restraint or coercion within the meaning of Section 8(a) (1) of the Act."