**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ORLEANS MFG. CO., Inc., Respondent.**

**No. 523, Docket 32996.**

United States Court of Appeals
Second Circuit.

Argued May 12, 1969.

Decided May 29, 1969.

Frank H. Itkin, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Eugene B. Granoff, Richard N. Chapman, N.L.R.B., on the brief), for petitioner.

Alan J. Levenson, Levenson & Levenson, Portland, Me., for respondent.

Before WATERMAN, SMITH and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

The National Labor Relations Board petitions for enforcement of its order against the Orleans Mfg. Co., Inc. (the Company) issued March 11, 1968. The Board found that the Company had violated § 8(a) (1) of the Act by interrogating its employees about their union activities, by maintaining an overly broad rule forbidding the distribution of literature on Company premises, and by promising and granting wage increases for the purpose of discouraging union membership. Additionally, the Board found that the Company had violated both § 8(a) (1) and (3) by discharging an employee because of his union activities. Accordingly, the Board ordered the Company to cease and desist from its unfair labor practices, to rescind the illegal no-distribution rule, to offer re-instatement and back pay to the discharged employee, and to post appropriate notices. With one modification indicated below, we grant the application for enforcement.

The Company is engaged in the manufacture of furniture at its plant in Orleans, Vermont. At the time of the events in question it employed approximately 423 employees exclusive of supervisory and clerical personnel.

During the latter part of November 1966, a representative of the United Furniture Workers of America (the Union) contacted one of the Company's employees, Kenneth Prue, and expressed interest in organizing the plant. Shortly thereafter, on December 5, fifteen of the employees met with Union representatives and decided to try to unionize the plant; Prue was given authorization cards, which he then distributed among employees attending the meeting. Between that time and January 23, 1967, the date of Prue's discharge, 130 signed authorization cards were obtained from the employees.

After learning about the possibility of an attempt to organize the plant, the Company's manager Bjarne Kvingedal spoke to all the employees, department by department, on November 28, 1966. While affirming the right of the employees to join a union if they wished, he indicated the disadvantages of unionization, and concluded his speech by advising the employees to report to him any threats made to them in connection with the organization campaign.

I. *The Alleged Illegal Interrogation*

On January 9, foreman Gilfillian approached employee Larry Broe while Broe was at work and discussed the Union with him. In the course of the conversation, Gilfillian asked Broe if he was going to the Union meeting that night, and Broe replied that he was. On January 18, foreman Curtis spoke to Prue while he was at work, commenting, "I hear you need only 20 more cards to get the union in." Prue disavowed any knowledge on the subject.

■ The Board found that these two conversations constituted illegal interrogation which coerced the employees and also gave them the impression that their union activities were under close surveillance by the Company. We believe however, that these two isolated incidents were too innocuous to give rise to a violation of § 8(a) (1). Up to the time of Gilfillian's and Curtis' comments there was no history of Company hostility toward the Union. Moreover, the conversations were between the employees and their immediate supervisors. Also, they took place at the employees' work stations, thus giving rise to no atmosphere of unnatural formality. In sum, we do not find in these brief and unrelated conversations the indicia of coercion requisite to a determination of illegal interrogation. See Bourne v. N.L.R.B., 332 F.2d 47 (2d Cir. 1964) (*per curiam*).

## II. *The No-Distribution Rule*

■■ During the time of the Union's organizational campaign and for some years previously, the Company maintained a rule prohibiting the distribution of literature on Company premises without written authorization. The Board found that since this rule forbade such distribution by the employees on non-working time in non-working areas, such as the Company lunchroom and parking lot, it was overly broad, and hence invalid under § 8(a) (1). Since the Company has suggested no special circumstances adequate to justify the extensive ban on distribution it has imposed, we must agree with the Board that the rule is invalid. N.L.R.B. v. United Aircraft Corp., Pratt & Whitney Aircraft Division, 324 F.2d 128 (2d Cir. 1963), cert. denied, 376 U.S. 951, 84 S.Ct. 969, 11 L.Ed.2d 971 (1964). Nor do we believe that this overbreadth is cured by the provision that distribution may be permitted upon Company authorization. Since the employees have a statutory right to distribute Union literature in non-work areas on their free time, the Company may not require them to obtain its permission to exercise that right. See Republic Aluminum Co. v. N.L.R.B., 394 F.2d 405, 407, n. 1 (5th Cir. 1968).

## III. *The Promise and Grant of Wage Increases*

An amendment to the Fair Labor Standards Act increased the federal minimum wage from $1.25 to $1.40 an hour, effective February 1, 1967, and to $1.60 an hour, effective February 1, 1968. At various meetings during 1966, Company management expressed the fear that the new minimum rate might make it unable to price its products competitively. The Company maintains that it decided to comply with the new law gradually; therefore, on October 10, 1966, it raised the lowest beginning day rate to $1.40 per hour, the increase then to be applicable only to new employees and not to the older employees in the same category. On January 16 of the following year, the Company notified all the employees that "[i]n keeping with [its] policy of continuously reviewing [its] wages and fringe benefits" it would make the following "changes and improvements" as of February 1, 1967: all non-probationary day rate employees making less than $1.50 per hour were to receive at least that amount; those earning $1.50 or more per hour were to receive a $.06 per hour increase; and the overall wages of incentive rate employees were raised by improvements in their vacation and holiday pay. The notice did not mention that the new wage scales were in any way necessitated or prompted by the new requirements of the Fair Labor Standards Act. It is of some interest that during this period of time the Company was laying off employees because of a decrease in available work occasioned by a reduction in its backlog of orders.

■ The Board found that the Company's announcement of across the board wage and benefit increases in excess of those legally required, coming in the midst of the Union's organizational drive and at a time when the Company was

concededly concerned about its labor costs and was laying off other employees, was in fact made for the purpose of discouraging the employees from joining the Union and thus violated § 8(a) (1). N.L.R.B. v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964). Although the Company argues strenuously that its voluntary wage increases were given for the purpose of reducing wage inequalities produced by the increase in the minimum wage, we believe that the Board's rejection of this rationalization is supported by substantial evidence. Thus, the Company's professed concern with fairness is contradicted by the evidence that it paid its new employees a minimum of $1.40 per hour as of October 1966 while paying its more senior employees performing exactly the same work a lesser wage until February of the following year. Similarly, it seems incredible that the Company's concern for fairness among all it employed, would lead it to increase its labor costs more than necessary when it had previously complained that the required increases would destroy it. Moreover, the Company at no time indicated to its employees that these extra increases were given for the purpose of eliminating inequities caused by the raise in the federal minimum wage.

## IV. *The Discharge of Employee Prue*

On January 23, 1967, the Company discharged Kenneth Prue for allegedly threatening several fellow employees while soliciting their support for the Union. The Company seeks to justify its action on the basis of three incidents. First, the Company learned that on the previous Friday evening Prue and one Dawson, a fellow employee, had engaged in a fistic encounter at a local tavern. Monday morning, January 23, Dawson was summoned to Company offices where he was confronted by a management committee of three, including Kvingedal, who asked Dawson whether his fight with Prue had been over the Union. Although all three members of this committee testified before the Trial Examiner that Dawson admitted that the Union was the subject of the altercation, at the hearing Dawson denied ever having made such a statement and went on to testify that in fact he had told Kvingedal he could not remember exactly what the fight had been about because both he and Prue had been quite drunk at the time.

Second, on the same morning, management was allegedly informed that Prue had threatened another employee, Guyette. Guyette was similarly summoned before the committee, where he stated that Prue had told him that if he did not sign the Union authorization card the Company could fire him at any time, but if he did sign he would be protected by the Union and by federal law. At the hearing, Prue denied making any threat but admitted saying that the Union would protect the employees' job security.

Third, employee Dow complained to her foreman that morning that Prue had threatened her. She also was summoned to the office and repeated her story to Kvingedal and the two other management officials with him. At the hearing, Mrs. Dow was contradicted not only by Prue, but also by three other employees who had overheard his conversation with her, including her own daughter.

In any event, immediately after the conclusion of these three interviews, Kvingedal summoned Prue to the office and stated that he had received signed statements charging that Prue had threatened other employees. When Prue made an effort to deny these alleged threats, Kvingedal cut him off and immediately announced that he was fired.

Based upon his observation of all the witnesses, the Trial Examiner credited Dawson's testimony that he had never charged that his fight with Prue concerned Union activities. He also believed Prue's statement that he had not threatened Guyette but merely tried to convince him of the advantages of a union, and the Examiner further concluded that Guyette's statement to Kvin-

gedal had not been such as to indicate clearly that any threat had been made. Lastly, he rejected Mrs. Dow's contradicted claim that Prue had threatened her.

 Based upon the Trial Examiner's findings, the Board determined that Prue's discharge violated both §§ 8(a) (1) and (3). The Supreme Court has instructed: "§ 8(a) (1) is violated if it is shown that the discharged employee was at the time engaged in a protected activity, that the employer knew it was such, that the basis of the discharge was an alleged act of misconduct in the course of that activity, and that the employee was not, in fact, guilty of that misconduct." N.L.R.B. v. Burnup & Sims, Inc., 379 U.S. 21, 23, 85 S.Ct. 171, 172, 13 L.Ed.2d 1 (1964). In this case, the first three criteria of *Burnup* were clearly met. Prue was engaged in the protected activity of soliciting Union membership, the Company knew this to be the case, and the alleged threats which were the basis of the discharge occurred in the course of his solicitation activities. The only question which remains is whether Prue uttered any threats. We believe the Board's finding that he did not is amply supported by the evidence in the record to which we have already made reference.

Similarly, we find substantial support for the Board's finding that the discharge was motivated by discriminatory anti-Union animus and therefore violated § 8(a) (3). In this regard, the manner in which the Company effected the discharge is most significant. To begin, Kvingedal actually solicited employee complaints of Union threats. And after succeeding in gathering two such complaints (Dawson refused to cooperate), Kvingedal immediately summoned Prue and discharged him, without investigating the truth of the incriminating allegations or even allowing him to speak in his own behalf. Like the Board, we can only interpret these unrefuted facts as indicating that the Company wished to fire Prue for his Union activity, of which it admits knowledge,

and that it seized upon the first available pretext for accomplishing this illegal purpose.

The order of the Board is modified by striking from paragraph 1(c) the words "Coercively interrogating employees as to their union activity or that of fellow employees." Enforcement of the order as thus modified is granted.