434 F.2d 473
 73 L.R.R.M. (BNA) 2803, 140 U.S.App.D.C. 199
 INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE
WORKERS, AFL-CIO, LOCAL 806, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, SNC
Manufacturing Co., Inc., Intervenor.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
SNC MANUFACTURING CO., Inc., Respondent.
 Nos. 22671, 22804.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Sept. 23, 1969.
Decided March 20, 1970.
 
 Mr. Herbert Fishgold, Attorney, National Labor Relations Board, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, and Marcel Mallet-Prevost, Assistant General Counsel, National Labor Relations Board, were on the brief, for petitioners in No. 22,804 and respondent in No. 22,671.
 Mr. Russ R. Mueller, Milwaukee, Wis., for respondent in No. 22,804 and intervenor in No. 22,671. Mr. Walter S. Davis, Milwaukee, Wis., was on the brief for respondent in No. 22,804 and intervenor in No. 22,671.
 Messrs. Irving Abramson, Melvin Warshaw, New York City, and Miss Ruth Weyand, Washington, D.C., were on the brief for petitioner in No. 22,671.
 Before McGOWAN, TAMM and MacKINNON, Circuit Judges.
 MacKINNON, Circuit Judge:
 
 
 1
 This is a consolidated appeal in two cases involving a Decision and Order of the National Labor Relations Board[1] (hereinafter 'Board'). This court has jurisdiction under 29 U.S.C. 160(e) and (f).
 
 
 2
 In case No. 22671, the International Union of Electrical, Radio and Machine Workers, AFL-CIO, Local 806 (hereinafter 'Union') challenges (1) the Board's finding that certain wage increases given to the employees near election time did not violate section 8(a)(1) of the National Labor Relations Act (hereinafter 'Act'); and (2) the Board's failure to grant certain remedies requested by the Union. SNC Manufacturing Company, Inc., a producer of transformers located in Oshkosh, Wisconsin, (hereinafter 'Company' or 'SNC'), is the real party in interest, and appears as intervenor.
 
 
 3
 Case No. 22804 is the cross-application by the Board for enforcement of its order. In this case, SNC is respondent and resists enforcement and challenges the finding of the Board that it was guilty of illegal acts near election time.
 
 
 4
 On July 1, 1967, a one year collective bargaining agreement between the Union and the Company expired upon the notice of termination given by the Union. At that time the Company challenged the Union's majority status. On December 4, 1967, the Union petitioned the Board for an election. The parties entered into a Stipulation for Certification upon a Consent Election which stipulation was approved by the Board's Regional Director on December 19, 1967. A secret ballot election was held on January 10, 1968, which the Union lost 69 to 64, with four ballots challenged and one was void.[2] Union objections to the election were timely filed, and the Union later filed charges against the Company alleging that the Company had violated section 8(a)(1) and (3) of the Act and that the employer interfered with, restrained and coerced employees in the exercise of the rights guarnateed in section 7 of the Act.[3] Because the objections to the election and the charges of unfair labor practices were based on the same issues of fact, the unfair labor practices case and the representation case were consolidated and the complaint was issued.[4] After hearing the Trial Examiner issued his Decision and Recommended Order and thereafter the Board fully reviewed the Examiner's findings.
 
 
 5
 The Board's Decision and Order, modifying and adopting the Trial Examiner's findings, consisted of directives to SNC Manufacturing Company, Inc., its officers, agents, successors, and assigns, inter alia, to:
 
 1. Cease and desist from:
 
 6
 (b) Maintaining or enforcing any rule which prohibits union solicitation on company property on the employees' own time.
 
 
 7
 (c) Promulgating, publishing, or enforcing any Rule proscribing or prohibiting the distribution of Union literature in the plant or on Company property, to the extent such rule is applied to the non-worktime of the employees, or non-work areas of the plant.
 
 
 8
 (d) Threatening employees with disciplinary action for engaging in the distribution of Union literature during the non-worktime of employees, or in non-work areas of the plant. 2. Take the following affirmative action designed to effectuate the policies of the Act:
 
 
 9
 (a) Make whole Dawn Towns for any loss of pay she may have suffered by reason of Respondent's discrimination against her, on January 9, 1968. * * *
 
 
 10
 (b) Preserve and make available to the Board * * * all payroll records * * * necessary to analyze, compute and determine the amount of backpay to which Dawn Towns may be entitled under the terms of this Trial Examiner's Decision.
 
 
 11
 (c) Post at its plant in Oshkosh, Wisconsin, copies of the notice * * * marked 'Appendix' * * * (to be) signed by Respondent's representative, be posted by the Respondent and maintained by it for 60 consecutive days thereafter in conspicuous places, including each of Respondent's bulletin boards. * * *
 
 
 12
 (d) Notify the Regional Director * * * in writing, within 20 days from the date of the receipt of this Trial Examiner's Decision what steps the Respondent has taken to comply for the foregoing Recommended Order.
 
 
 13
 * * * FURTHER ORDERED that the election, held on January 10, 1968 * * * be, and it hereby is, set aside, and that case be remanded to the Regional Director * * * for the purpose of conducting a new election at such time as he deems circumstances permit free choice of a bargaining representative.
 
 
 14
 The Union petitioned this court to review and enforce the Decision and Order of the Board and the Board has filed a cross-application for enforcement of its Order. The two cases were consolidated by order of this court.
 
 
 15
 Hereafter the issues are divided into three categories, to wit: I, those raised by the Union with respect to the Board's findings in the unfair labor practices case; II, those raised by the Company regarding the unfair labor practices case; and III, those raised in regards to the representation case.
 
 
 16
 * First, the Union challenges the Board's finding that certain wage increases granted to the employees of the Company near the time of the election were not intended to influence the result of the January 10th election and hence did not violate section 8(a)(1) of the Act.[5]
 
 
 17
 On December 15, 1967, the Company granted approximately fifty of its employees (about one-third of the whole unit) unannounced wage increases for the pay period beginning November 26, ending December 9 and payable December 25th. The Union contends, and the Trial Examiner so found, that the wage increases were intended to illegally influence the January 10 election. The Board, in its decision, rejected the Trial Examiner's findings on the issue. It was uncontradicted that the Company's decision to increase wages occurred three months prior to the filing of the Union's petition for representation. There was also testimony to the effect that the wage increases in question were just one step in a general plan design to meet the new minimum wage requirements scheduled to go into effect in February of 1968, and, in accordance with past practice of the Company, to do so prior to the effective date of the revised act, so as to enable the Company to compete with the rest of the industry for qualified personnel; and, maintain wage differentials among the employees. Although it is true that all but a few of the employees were already above the new minimum wage requirement when the raises were given, it is not unreasonable to assume, as the Board did, that one objective of a valid scheme might be completely achieved before the others. We find it significant that the payment period in question was the fourth step in a five step plan.[6] It is of further significance that the Company informed the Union of their intention to pay the wage increase at a labor-management meeting two days prior to December 15 and the Union representatives did not object.
 
 
 18
 The facts upon which the Board made its decision are open to conflicting inferences. That being the case, this court is not at liberty to draw an inference different from the one drawn by the Board even if it may seem more plausible or reasonable. National Labor Relations Act, 29 U.S.C. 160(e).[7] Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 485, 71 S.Ct. 456, 95 L.Ed. 456 (1951); National Labor Relations Board v. Denver Bldg. and Trades Council, 341 U.S. 675, 691, 71 S.Ct. 943,95 L.Ed. 675 (1951); National Labor Relations Board v. Challenge-Cook Brothers of Ohio, Inc., 374 F.2d 147, 152 (6th Cir. 1967) and cases cited therein; Stark Ceramics, Inc. v. N.L.R.B., 375 F.2d 202 (6th Cir. 1967). The fact that the Board and the Trial Examiner disagreed on the ultimate result does not mean that the evidence supporting the Board's decision is less substantial. Universal Camera Corp. v. National Labor Relations Board, supra; N.L.R.B. v. Dell, 283 F.2d 733, 736, 739 (5th Cir. 1960).
 
 
 19
 Secondly, the Union contends that the Board should have ordered the Company (1) to permit Union access to the Company's bulletin board, and (2) to furnish the Union with a list of all the names and addresses of the Company employees or require the Company to mail a copy of the Board's Order to the Company employees.
 
 
 20
 The fact is that the Board, in its Order, did require the Company to post a written statement, in the form prescribed by the Board, in some conspicuous place in the plant for 60 days. The obvious purpose of this was to give the employees notice of the Board's Decision and Order. Just what remedies are necessary to insure that a decision and order of the Board is effective is a matter largely for the Board's discretion. To successfully attack the Board's remedy one must show that the remedies prescribed by the Board are clearly inadequate in the light of the findings of the Board. The Board's wide discretion to fashion appropriate remedies insulates its action in this case from judicial intervention.[8]
 
 II
 
 21
 In case No. 22804 (the cross-application by the Board for enforcement of its Order), this court approved a Pre-hearing Stipulation by the parties agreeing to four issues on appeal, as to each of which the Company challenges the findings of the Board. The stipulated issues are hereafter set forth.[9]
 
 The No-solicitation Rule
 
 22
 1. Whether the Board properly found the maintenance of the Company's no-solicitation rule to be invalid. (Stipulated issue)
 
 
 23
 On January 3, 1967, Plant Superintendent Esslinger posted the following rule on the Company bulletin board:
 
 
 24
 'It is the rule of the Company that unauthorized solicitation of employees or customers upon the premises or in the area of the plant by or on behalf of any club, society, labor union, religious organization, political party or similar association is strictly prohibited. The prohibition applies both to employees on working time and to outsiders, and it covers soliciting in any form, whether for membership, for subscription, or for payment of money.'
 
 
 25
 The Trial Examiner did not find this rule to be invalid but the Board disagreed and ordered the following added to the Examiner's Recommended Order:
 
 
 26
 '* * * substitute therefor the following paragraph 1(b):
 
 
 27
 '(b) Maintaining or enforcing any rule which prohibits Union solicitation on Company property on the employees' own time.'
 
 
 28
 This Board order is based upon its finding that the rule 'on its face is too broad, in that it prohibits employee solicitation anywhere on Company property, and is therefore presumptively invalid.' The Board also found inferentially that the posted rule was 'a restriction of employee solicitation during an employee's own time.' A reading of the posted rule does not support the Board's construction that the posted rule 'on its face' prohibits solicitation anywhere on Company property during an employee's own time. The posted rule states it is limited 'to employees on working time' and we interpret this to mean the time that an employee is required to work, exclusive of break periods. We thus find no basis for section 1(b) of the Board's Order and order it deleted. In coming to this conclusion we agree with the findings of the Trial Examiner that the posted no-solicitation rule is 'unrelated by its terms' (hence 'on its face') to the subject of no-distribution. We thus find that the Company was not applying the 'no-solicitation' rule when it stopped the distribution of literature on November 30, 1967 and January 4 and 9, 1968, but was applying the same no-distribution rule as Esslinger announced orally on January 4, 1968. We recognize that such conclusion is contrary to the argument made by the Company's counsel on this appeal but we decide that the actions of the Company's agents are to be judged in the context in which they took place in the plant and are not to be controlled by the characterization that counsel seeks to engraft upon them in subsequent legal proceedings. We are fortified in this conclusion by the fact that the language of the rule is so clear in stating that it only refers to 'working time' that there is absolutely no basis for applying the posted rule to 'non-working time.' A different result might be reached if the rule was ambiguous on this point, but it is not. It is significant that the employees did not consider the posted no-solicitation rule to be ambiguous and were not intimidated thereby since every employee who was stopped in the act of distributing literature in the plant asserted that they had a clear right to do what they were doing and that the Company was mistaken in asserting they could not do so. The intimidation of employees came from the oral announcement of the broad no-distribution rule and not from the posted no-solicitation rule. We thus cannot read into the posted rule an attempt by the Company to prohibit Union solicitation on an employee's non-working time as is suggested by the Board's brief.[10]
 
 
 29
 We likewise cannot read into Esslinger's actions on November 30, 1967, when he stopped Kinderman in the act of distribution of Union literature in the Company parking lot, that Esslinger was enforcing the no-solicitation rule, any more than he was enforcing the no-solicitation rule on January 4 and 9, 1968 when he caused the distribution of Union literature to be stopped in the plant. The Board has found that these two latter incidents were not related to the posted no-solicitation rule and we see no basis to distinguish these two latter incidents from the November 30th incident insofar as the no-solicitation rule is concerned. We find that all three incidents wherein Esslinger stopped the distribution of literature, and caused it to be stopped, indicate an identity of purpose. We recognize that the November 30th incident preceded the filing of the Petition for the Election and may have limitations in the representation case. In this case, however, we rely upon it primarily as being evidence of the broad no-distribution rule that Esslinger was enforcing and also find that it constituted an 8(a)(1) violation.
 
 
 30
 The No-distribution Rule and Threats of Disciplinary Action
 
 
 31
 2. Whether substantial evidence on the record as a whole supports the Board's finding that the Company violated Section 8(a)(1) of the Act by promulgating and enforcing a broad no-distribution rule and by threatening disciplinary action for distributing literature in the plant (Stipulated issue)
 
 
 32
 The unfair labor practice charge is, and the Board found, that the Company violated section 8(a)(1) by promulgating and enforcing a broad no-distribution rule and by threatening disciplinary action for distributing literature in the plant. (The threat of disciplinary action is dealt with later.)
 
 
 33
 The broad no-distribution rule referred to was orally announced by Esslinger and other supervisors to employees distributing literature on Janaury 4 and 9, 1968 to the general effect that
 
 
 34
 'You are not allowed to pass out Union literature in the plant.' (Tr. 75)
 
 
 35
 As announced on every occasion it prohibited employees from distributing Union literature in work areas and non-work areas and on work time and non-work time.
 
 
 36
 To the charge the Company replies that the employees were only stopped from distributing literature in working areas. However, we find substantial evidence that employees Kinderman and Dawn Towns were prohibited from distributing literature in non-working areas. This, in itself, disposes of the Company's contention, but there is more answer than that to the Company's argument.
 
 
 37
 The Company's reply deals only with the circumstances in which the rule was enforced and does not squarely meet the charge that an excessively broad no-distribution rule was promulgated (not just enforced). In the instances referred to by the Company (with one exception), the circumstances where distribution of literature was actually stopped by the Company were all in working areas but when the Company's agents did so they immediately orally announced, in effect, that no literature could be distributed anywhere in the plant. In such circumstances it was entirely reasonable for employees to recognize and be guided not only by what the Company's agents did but also by what they said. Accordingly we find substantial evidence of what is only a normal reaction in such a situation, that employees were intimidated by the announcement of the overly broad rule and by such ambiguous acts of enforcement into thinking that they could not distribute Union literature anywhere 'in the plant' at any time. There is no doubt that promulgating (announcing) an excessively broad rule under such circumstances is a violation. In some instances the rule was not enforced in some non-working areas (locker, lunch and wash rooms) but still left indefinite was the application of the rule to other non-working areas such as the passageways and vacant spaces in the plant. There was also evidence that, at least on November 30, 1967, Esslinger considered the parking lot during non-working time as a prohibited area for the distribution of literature and then and there enforced such a rule. This was the so-called Kinderman incident.
 
 
 38
 On November 30, 1967, an employee, Kinderman, before his working time began but after he had punched in, was prohibited by Esslinger, the Company superintendent, from distributing literature in the Company parking lot. This was a non-working area and the employees' working time had not started. It is a clear section 8(a)(1) violation.
 
 
 39
 Other specific instances when the broad rule was announced occurred on January 4, 1968, when Esslinger personally, and through certain foremen by his order, informed employees (Towns, Beyer, Kaul, Kallin and Schessler) during a break period (a non-working period for the entire plant) that they were to stop distributing literature 'in the plant.' That the Company intended the rule to be applicable during non-working periods is proved by Esslinger's testimony in which he admitted he was trying to stop the distribution of literature during non-working break periods because, he alleged, discussion of Union literature continued after the break period and interfered with production.
 
 
 40
 Another instance occurred when employee Dawn Towns was sent home as disciplinary action by Esslinger on January 9, 1968 (the day before the scheduled election) for distributing Union literature during a break period in a passageway near the door of the men's locker room because she had been told on January 4, 1968 that it was against the rule to distribute literature 'in the plant' without any working time restriction. With respect to the Towns' incident, we find there was substantial evidence to support the Board's conclusion that the passageway in which Dawn Towns was distributing her literature was, in fact, a non-working area. The Trial Examiner took into consideration the photograph of the passageway, the testimony that there were some storage bins along one side of the passageway and the fact that it was this passageway that led past the men's locker room to the women's locker room. Although we recognize that a different conclusion on these facts is arguable, there is substantial evidence to support the conclusion of the Board. This being the case, the Board's finding on this matter is not reviewable by this court. Universal Camera Corp. v. National Labor Relations Board, supra.
 
 
 41
 In summary, it may be said that the Company contends it may limit the distribution of literature to non-working time and to non-working areas. We agree with this, but the deficiency in this contention, in addition to the instances when it stopped the distribution of literature in non-work areas during non-working time, is that the no-distribution rule it announced[11] did not say that literature could be distributed in non-working areas on non-working time. It was this overly broad rule that the Company announced it was enforcing when on several instances its supervisors stopped the distribution of literature in the plant.[12] Thus, there is substantial evidence that the Company violated section 8(a)(1) by promulgating and enforcing a broad no-distribution rule.
 
 The Suspension of Dawn Towns
 
 42
 3. Whether substantial evidence on the record as a whole supports the Board's finding that the Company violated Section 8(a)(3) and (1) of the Act by suspending employee Towns. (Stipulated issue)
 
 
 43
 The facts are that Dawn Towns on January 4, 1968 was stopped by Esslinger from distributing Union literature during a factory break period (a non-working time). Esslinger told her 'he didn't want any more leaflets passed in the plant at all.' On January 9, 1968, she was again stopped from distributing Union literature during a factory break period by Esslinger who, after reminding her that he told her the other day that 'if anybody was passing leaflets in the plant I would ask them to leave,' he said to her, 'I am asking you to leave.' She complied with Esslinger's order and went home. In both instances she was passing out Union leaflets next to the door outside the men's locker room. This was a passageway that we have found to be a non-working area.
 
 
 44
 The order to Dawn Towns to go home suspended her. The Company argues that she was suspended for insubordination because she violated Esslinger's order. It cannot follow that she was insubordinate because she had a legal right to distribute Union literature at the time and place she did and Esslinger had no right to stop her from doing so or to suspend her for having done it. To all the foregoing, it is a matter in aggravation that the no-distribution rule as personally announced by Esslinger on these two occasions was invalid in that it prohibited all distribution of literature in the plant without any reference whatsoever to non-working areas or non-working time.
 
 
 45
 We accordingly find substantial evidence to support the Board's finding that the Company violated section 8(a)(1) and (3) by suspending Dawn Towns.
 
 III
 
 46
 The Board's Order Setting Aside the Election
 
 
 47
 4. Whether the Board properly set aside the election. (Stipulated issue)
 
 
 48
 The Company has challenged the Board's order directing the holding of an election. This portion of the order was issued by the Board in the representation case. It is not reviewable by this court at this time since it is well settled that the power to direct an election in a representation case is vested by section 9(d)[13] of the Act in the Board, not in the court, and that the Board order directing an election is not a final order that is reviewable under section 10(e) and (f).[14] Court review is not authorized until the Board has issued an order requiring the Company to do something predicated upon the result of the election. Daniel Construction Co. v. N.L.R.B., 341 F.2d 805, 809-810 (4th Cir. 1965); Boire v. Greyhound Corp., 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964); National Labor Relations Board v. Falk Corp., 308 U.S. 453, 458-459, 60 S.Ct. 307, 84 L.Ed. 396 (1940).
 
 
 49
 Affirmed.
 
 
 50
 Pay period for which Number of employees Amount of hourly
 raise granted 1967 receiving increase increase in pay
 10/1 to 10/14 5 employees 3 cents to 6 cents
 2 " 8 cents
 10/15 to 10/28 57 " 5 cents to 7 cents
 " 1 " 8 cents
 10/29 to 11/11 60 " 5 cents to 7 cents
 " 7 " 8 cents
 11/12 to 11/25 18 " 5 cents to 7 cents
 " 3 " 8 cents
 11/26 to 12/9 41 " 5 cents to 7 cents
 " 6 " 12 cents
 
 
 51
 McGOWAN, Circuit Judge (dissenting in part):
 
 
 52
 I join in the opinion for the court except with respect to the portion of the Board's order directed to the no-solicitation rule. The rule as promulgated seems to me to be, in the court's own characterization of the no-distribution rule (Note 11), at the very least 'so vague as to what could be done in non-working areas and on non-working time * * * that its coercive effect is undeniable.' It may be true that its application was not involved in this case, but the coincidental application made by the company of its related no-distribution rule was such as to intensify the possibly coercive effect of the ambiguities in the no-solicitation rule. I do not consider that actual application is necessary in order to authorize the Board to direct the clarification of a dangerously ambiguous rule. See Campbell Soup Co. v. NLRB, 380 F.2d 372 (5th Cir. 1967).
 
 
 
 [1]
 174 N.L.R.B. No. 31 (1969)
 
 
 [2]
 The record is silent as to the final disposition of these ballots
 
 
 [3]
 'Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.' 29 U.S.C. 157 (1964)
 
 
 [4]
 Case Nos. 30-CA-738 and 30-RC-771
 
 
 [5]
 The Trial Examiner found to the contrary. )
 
 
 [6]
 
 Between 10/17 and 11/26, 146 employees out of a total of 157 received a raise in one of the pay periods. Eight received 2 pay raises in the first 4 pay periods. The Company asserts the Minimum Wage Act as justification for the increases. And while only 7 employees were below the $1 per hour statutory minimum at the time of their raises, we recognize that the general effect of such legislation is to cause some upward adjustment justment of wages in closely related brackets because of the effects of competition for workers and the demands of general employee relations.
 
 
 [7]
 '* * * The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. * * *' 29 U.S.C. 160(e)
 
 
 [8]
 United Steelworkers of America, AFL-CIO, Local 5571 v. NLRB, 130 U.S.App.D.C. 369, 373, 401 F.2d 434, 438 (1968)
 
 
 [9]
 Although the representation case and the unfair labor practices case are based on the same set of facts, we are now dealing solely with the Board's cross-application for enforcement of its Decision and Order in the unfair labor practices case
 
 
 [10]
 The Board's brief on this point starts out citing cases holding that prohibiting Union solicitation 'on non-work time, although on Company property' is a section 7 violation. It then attempts to use these 'above cited precedents' to support the Board's finding that the rule 'on its face (is) too broad, in that it prohibits employees' solicitation anywhere on Company property' (without any reference to non-working time.) Next it seeks to ignore the second sentence of the posted no-solicitation rule. Finally, it attempts to tie the Company's enforcement of the oral no-distribution rule to the posted no-solicitation rule. So the Board's position is based on a combination of (1) distinguishable authorities, (2) a failure to recognize the second sentence in the posted rule and (3) of acts outside the 'face' of the rule which the Examiner found unrelated to the no-solicitation rule. None of these arguments justify a determination that the rule 'on its face' is invalid. In passing, we note that the Company's brief also indulges in shifting bases for some of its arguments. Some of these are hereafter referred to
 
 
 [11]
 As distinguished from the posted no-solicitation rule
 
 
 [12]
 At the very least the rule, as announced, was so vague as to what could be done in non-working areas and on non-working time, and was applied in such an inconsistent manner, that its coercive effect is undeniable
 
 
 [13]
 29 U.S.C. 159(d)
 
 
 [14]
 29 U.S.C. 160(e) and (f)