GROENDYKE TRANSPORT, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 74–1511.

United States Court of Appeals, Tenth Circuit.

Feb. 11, 1976.

138

Cliff W. Ratner, Wichita, Kan. (Payne H. Ratner, Jr., Wichita, Kan., on the brief), for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C. (Morton Namrow, Atty., Peter G. Nash, Gen. Counsel, John S. Irving, Jr., Deputy Gen. Counsel, and Patrick H. Hardin, Associate Gen. Counsel, N. L. R. B., Wash-

ington, D. C., on the brief), for respondent.

Before HILL, HOLLOWAY and BARRETT, Circuit Judges.

HOLLOWAY, Circuit Judge.

Groendyke Transport, Inc., petitions for review of, and to set aside, a decision and order of the National Labor Relations Board and the Board cross-petitions for enforcement for its order entered in Groendyke Transportation, Inc., 211 NLRB No. 139.[1]

The Board found that a no-distribution rule of Groendyke prohibiting employees from "distributing, posting or otherwise circulating handbills or literature of any type on company property during working hours" violated § 8(a)(1) of the National Labor Relations Act, 29 U.S.C.A. § 158(a)(1), and that the discharge of employee Bynum under the rule for offering union literature and an authorization card violated § 8(a)(3) and (1), 29 U.S.C.A. § 158(a)(3) and (1). The Board also found that the company violated § 8(a)(1) by interrogation of employees Bynum and Foster. The Board ordered Groendyke to cease and desist from the unlawful practices and to reinstate Bynum with back pay.

Groendyke argues that the no-distribution rule is valid and that the discharge of Bynum for violation of the rule did not contravene § 8(a)(3) and (1). The company also contends that the remote instances of interrogation were not a sufficient basis for finding a violation of § 8(a)(1). We disagree and decline to set aside the Board's order, and grant enforcement.

The unfair labor practice charges had initially been heard by an Administrative Law Judge who dismissed the entire complaint in two written decisions.[2] In combination these two decisions specifically found that Groendyke "did not precipitously promulgate the [no-distribution] rule to thwart unionization"; that the no-distribution rule was reasonably enforced; that Bynum had engaged in the distribution of union literature on company time and in work areas; and that he could have been and was lawfully discharged for this reason. The Judge further found that Bynum's termination was not discriminatory (R. 361–62). As to the interrogation charge, the Judge found that there were only isolated acts of interrogation, two to four months before Bynum's discharge, which were too remote and technical to color the discharge with illegality.

As stated, the Board disagreed as to the ultimate findings to be made on the record. The Board essentially adopted the findings of subsidiary facts of the Administrative Law Judge, but made different ultimate findings and conclusions that violations of the Act had occurred. It is for the Board to make such final determinations on the charges. *S. A. Healy Co. v. NLRB*, 435 F.2d 314, 316 (10th Cir.). The issues before us concern the correctness of those determinations by the Board on the no-distribution rule and Bynum's discharge under it, and the interrogation issue.

## THE NO–DISTRIBUTION RULE AND BYNUM'S DISCHARGE

In early April, 1972, a Teamsters Local[3] began an organizational cam-

---

1. Board Member Jenkins filed a concurring statement. It was to the effect that he agreed with his colleagues in finding the violations, but that to the extent that Essex International, Inc., 211 NLRB 112, is pertinent, he relied on the reasons set forth in his dissent there, rather than on the majority decision.

2. An original and a supplemental decision of the Judge are involved here, but the procedural background relating to the two decisions is not significant for our purposes.

The case heard by the Administrative Law Judge and the Board involved an additional unfair labor practice charge concerning employee Kelly. The ultimate dismissal of that charge by the Board is not raised in this proceeding and we are not concerned with Kelly's case.

3. The local involved was the Southern Conference of Teamsters & Teamsters Freight, Tank Line & Automobile Industry Employees Local Union 988, affiliated with International Broth-

paign among Groendyke's [4] employees culminating in a Board conducted election held on August 31 and September 1, 1972,[5] which the union won. Bynum had been employed by Groendyke as a truck-driver for about fifteen months prior to his discharge on September 5. In April, Bynum learned of the organizational drive, executed a union authorization card, and solicited other drivers on behalf of the union. Bynum was appointed by the union to serve as an observer in the election.

On Saturday, September 2, Bynum went to Groendyke's Channelview terminal, where he was employed, to get his pay check. The Administrative Law Judge specifically found this was a non-work day for Bynum. When Bynum arrived at the terminal at 10:00 a. m. he was informed that the paychecks would not be available until noon. During this interval Bynum spoke to several off-duty drivers in the driver's lounge and on the parking lot. During these discussions he distributed union bumper stickers and sample collective-bargaining agreements. In addition, he handed out union authorization cards.

Subsequently, Bynum entered a lobby area of the terminal where he happened to see a driver whom he did not recognize. The man was a driver from Groendyke's Beaumont terminal, named Hendrickson. Bynum testified that he didn't know Hendrickson and according to Bynum, Hendrickson "was just standing in the reception room." (R. 88). Hendrickson, like Bynum, was awaiting the final preparation of paychecks by the payroll clerk, Felps. However Hendrickson, unlike Bynum, had driven from Beaumont in a company truck and had been assigned the duty of picking up the paychecks for all the drivers out of the Beaumont terminal and returning to the

terminal with the checks. Although it was not disputed that Hendrickson was merely "standing around" when Bynum approached him, the Judge found that Hendrickson "was engaged in normal work duties in the terminal when he appeared to pick up the paychecks for his fellow employees" (R. 361).

Bynum asked Hendrickson whether he was interested in joining the union. When Hendrickson responded affirmatively, Bynum offered him some union literature and an authorization card. Groendyke's terminal manager, Stinson, observed this exchange and immediately called Bynum into the office and asked whether he was aware of Groendyke's no-distribution rule. When Bynum replied that he was not aware of the rule, Stinson led Bynum to the driver's lounge where the no-distribution rule was posted. Stinson read Bynum the rule:

Employees are prohibited from distributing, posting or otherwise circulating handbills or literature of any type on company property during working hours. Employees violating this rule will be discharged.

Stinson testified that Bynum said he didn't think he was violating the rule; that he told Bynum he thought he was violating the rule; and that he asked Bynum to put the literature in his car until the question was determined. Bynum testified that Stinson told him "that as long as it was a company policy he would not be allowed to solicit or hand out any literature on company property, and told me to put this literature in my car" (R. 90). Bynum engaged in no further distribution of literature, went to his car, and drove away.

The same afternoon Stinson began procedures to terminate Bynum's employment. After receiving authority from the home office, Stinson terminat-

erhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, hereafter called the union.

4. Groendyke, an Oklahoma corporation, has general offices at Enid, Oklahoma and operates 29 terminals in Oklahoma, Colorado and Texas, where it is engaged in the business of

transporting commodities in bulk throughout the South Central United States. One such terminal is located in Channelview, Texas, where the incidents in question occurred.

5. All dates referred to in this opinion are in 1972 unless otherwise noted.

ed Bynum on September 5. The Judge found that Bynum was apprised by Stinson that the Enid office had instructed Stinson to terminate Bynum "for passing out union literature" (R. 360). It was on these facts that the Board's findings and order adverse to the company were entered.

The company argues, *inter alia*, that its no-distribution rule was valid on its face, citing *Walton Manufacturing Co.*, 126 NLRB 697, enforced, 289 F.2d 177 (5th Cir.); *International Union v. NLRB*, 140 U.S.App.D.C. 199, 434 F.2d 473; and *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372. It says the evidence showed Bynum was soliciting union membership and distributing union literature in a working area—the payroll clerk's office—while the payroll clerk was working; that the rule was not intended to apply to an employee soliciting a fellow employee, both being off-duty, in a non-working area such as the employees' lounge; that the rule is also presumptively valid as to its promulgation and enforcement; and that its validity may only be rebutted by proof of a discriminatory purpose in adoption or application of the rule (Petitioner's Brief, 10–11).

■ We start with recognition of the undisputed right of self-organization assured by the Act, and the equally undisputed right of the employers to maintain discipline in their establishments. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 797–98, 65 S.Ct. 982, 89 L.Ed. 1372. *Republic* upheld the Board's determination that "promulgation and enforcement" of a rule against "[s]oliciting of any type . . . in the factory or offices," id. at 795, 65 S.Ct. at 987, 988, violated § 8(a)(1) as an unlawful restraint of employees' § 7 rights, there being no showing of unusual circumstances by the company to outweigh the presumption against such rules. Id. at 803–04, 65 S.Ct. 982. *Republic* did in-

volve both the promulgation and the enforcement of such a rule. Our court has said that adoption of a no-solicitation, no-distribution rule is not, of itself, a violation of § 8(a)(1). See *NLRB v. American Coach Co.*, 379 F.2d 699, 701 (10th Cir.), citing *NLRB v. Shawnee Industries, Inc.*, 333 F.2d 221, 225 (10th Cir.); see also *NLRB v. United Steelworkers of America*, 357 U.S. 357, 363–64, 78 S.Ct. 1268, 2 L.Ed.2d 1383; *Serv-Air, Inc. v. NLRB*, 395 F.2d 557, 560 (10th Cir.), cert. denied, 393 U.S. 840, 89 S.Ct. 121, 21 L.Ed.2d 112.

*Shawnee Industries* involved broad rules against solicitation and distribution on the premises, but with a provision for approval of distribution and solicitation by management. This court said it saw nothing in the record to sustain an inference that these rules had been or would be used in a forbidden manner. And it was held that the mere promulgation of the rules was not a per se violation of the Act. *Shawnee Industries*, supra at 225.

■ Here, however, we have both promulgation and enforcement of a broad rule prohibiting distribution "on company property during working hours." And unlike the rules in *Shawnee Industries*, Groendyke's rule has no provision contemplating authorization for exceptions being granted to the bar against distribution. Moreover, the prohibition of distribution of literature of any type "on company property during working hours" is susceptible to the interpretation by employees that it applies to distribution on the employees' own time, which may be found to violate the Act where the required proof of unusual circumstances justifying the rule is lacking. *International Union v. NLRB* supra, 434 F.2d at 481; *NLRB v. Southern Electronics Co.*, 430 F.2d 1391, 1392 (6th Cir.); *NLRB v. Miller*, 341 F.2d 870, 873–74 (2d Cir.); *Essex International, Inc.*, 211 NLRB 112.[6] And a rule thus

---

6. The possibility that the phrase "working hours" is susceptible to misinterpretation formed the basis for the Board's decision in

*Essex International.* Here, the Board relies on the rule adopted in *Essex* that a no-solicitation rule using the term "working hours" is pre-

restricting distribution during the employees' own time impinges on rights protected by the Act. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 796, 803–04, 65 S.Ct. 982, 89 L.Ed. 1372.

We note particularly the Board's findings showing that this case is unlike *Shawnee Industries* which involved the mere existence of the rule. *Shawnee Industries,* supra at 225. Here the application and enforcement of the broad ban of the rule is shown by the Board's findings (R. 381–82):

> We also find that the discharge of Bynum violated the Act. When Terminal Manager Stinson discovered that Bynum was distributing union literature, he immediately informed Bynum that he was violating the no-distribution rule, showed the posted rule to Bynum, and told him to remove his literature to his car. Thus, even though the other employee involved may have been on his working time, and the distribution arguably occurred in a working area, Bynum was shown the unlawfully broad rule proscribing all distribution during working hours on company property. Respondent never explained to Bynum that he could distribute union literature during nonworking time and in nonworking areas of the Company's premises.

*    *    *    *    *    *

Moreover, record testimony indicates that the Respondent, pursuant to its no-distribution rule, never allowed anyone to engage in any distributing or soliciting on Company premises at any time. The broad proscription was enforced uniformly against everyone. There is no reason to believe that the Respondent would allow an exception for distribution of union literature during nonworking time and in nonworking areas.[7]

We are not persuaded by the company's arguments that the rule was presumptively valid and lawfully applied. We are instead satisfied that the record supports the Board's findings cited above. And we feel the record and the findings support the Board's conclusion that the unlawfully broad rule, which was applied to organizational activities without any indication of any exception during non-working time in non-working areas, was in violation of the Act.

■ Further, the Board found that since the no-distribution rule itself was unlawful, the rule was not a valid basis for Bynum's discharge. Accordingly the Board found that his discharge "for passing out union literature"[8] violated § 8(a)(1) and (3) of the Act, and ordered reinstatement and back pay (R. 382–83). We are persuaded that the findings concerning the discharge and the remedial

---

sumptively invalid while one using the term "working time" is presumptively valid (Brief for the Board at 9, n. 5), a broad proposition that we need not decide.

7. Counsel for Groendyke questioned Stinson as to the nature of Groendyke's terminal operations in an apparent attempt to demonstrate that a rule barring distribution during "working hours" was justified:

> Q This rule states during working hours. Will you please tell the Judge what the working hours of Groendyke Transport are, please, sir, at the Channelview terminal?
> A Twenty-four hours a day.
> Q Are there people there on duty 24 hours a day?
> A We only have one time that there has been nobody at the Channelview terminal, and that is from 5:00 o'clock Saturday evening until 7:00 o'clock Sunday morning.

> Q Other than that the Company does have day-round working hours, is that correct?
> A That's right (R. 54–55).

The Administrative Law Judge credited this testimony and found the operating hours to be as stated by Stinson (R. 360).

We read this testimony in a different light. To us, Stinson's testimony as to Groendyke's working hours supports the Board's conclusion that no exceptions to the rule would be permitted by the company. Yet we are convinced that sometime within a 24-hour period, employees have some non-working time during which distribution of union literature under proper circumstances cannot be prohibited.

8. At the hearing Stinson was asked:

> Q Except for your seeing Mr. Bynum pass out this material was there any other reason that you acted upon in seeking to fire him?
> A No, sir. (R. 28)

order are amply supported and not in error. Cf. *NLRB v. Miller*, supra, 341 F.2d at 874.

In sum, we conclude that the Board's rulings concerning both the no-distribution rule and Bynum's discharge under it should be sustained.

## THE INTERROGATION ISSUE

Employees Bynum and Foster testified that they had been subjected to questioning by the terminal manager, Stinson, concerning their attitudes toward the union during the course of the union's organizing campaign. Each said that he was questioned by Stinson on two different occasions, the first incident occurring sometime in late May or early June and the second incident occurring early in July (R. 183, 200).[9] Stinson denied questioning either employee concerning union activities (R. 214–15). The Administrative Law Judge found Foster and Bynum to be trustworthy and forthright witnesses and he credited their testimony and found the facts to be as reported by them (R. 374).

Essentially the two employees related incidents during which Stinson asked them what they thought about the union and what they thought the union could accomplish. Foster said that during the first incident in late May or early June Stinson argued the advantages and disadvantages of the union (R. 182); that during that first talk Stinson asked him how the other drivers felt about the union and that during the second talk in early July, Stinson discussed some union collective bargaining agreements with Foster and asked Foster how Bynum felt about the union (R. 183–85). Foster also said that on both occasions Stinson had called him into his (Stinson's) office, where they were alone, and that Stinson closed the door on the second occasion (R. 180–84). Foster said that the conversations were "out of the ordinary" because he and Stinson didn't normally talk about the union (R. 190–91).

Bynum testified that on the first occasion in the earlier part of June, he was called in to Stinson's office where they were alone; that Stinson asked what he thought the union "could do for us," and if he had heard any union discussions; that Stinson agreed their demurrage was too low but said the pay was as much as other tank line companies were paying. Bynum said the second occasion was in the latter part of July; that Stinson again asked him to come into his office where they were alone; that Stinson asked what his "main bitches were about the way things were running and if [he] had given any more thought to the union"; and that they discussed Bynum's pay as compared with that of other Groendyke drivers (R. 195–202). Bynum said the doors to Stinson's office were left open on both occasions when the discussions occurred (R. 206).

Although he found the testimony to be credible, the Administrative Law Judge found no unfair labor practices arising from these "isolated acts of interrogation" because they were "too remote in time to color with illegality the termination of Bynum," and that the acts of interrogation "are too isolated and technical to warrant remedial relief." (R. 375). The Board disagreed that the instances of interrogation were so isolated and technical as to warrant dismissal (R. 382), and it ordered Groendyke to cease and desist from interrogating its employees concerning their own and other employees' union membership, activities and desires, and to post a customary notice (R. 384, 388). Again, the Board disagreed with the Judge as to the ultimate findings and conclusions to be drawn and the need for remedial action.

The company argues that the Board erred in its finding of unlawful interrogation. Specifically, Groendyke maintains that the proof of isolated instances of interrogation fell far short of establishing illegal interrogation by the terminal manager; that casual, moderate in-

---

9. As stated earlier, the union organizational campaign began in April, 1972, and the Board conducted election was held on August 31 and September 1, 1972 (R. 358–59).

terrogation not amounting to threats or coercion is not unlawful; and that its supervisor could lawfully campaign with vigor against the union and point out disadvantages of union membership, citing *NLRB v. Orleans Manufacturing Co., Inc.*, 412 F.2d 94 (2d Cir.); *NLRB v. MacCollum Paper Co.*, 367 F.2d 761 (7th Cir.), and similar cases.

■ It is true that a record showing only isolated, innocuous incidents of interrogation, and unrelated conversations lacking the indicia of coercion, has been held insufficient to sustain findings of unfair labor practices under § 8(a)(1). *NLRB v. Orleans Manufacturing Co.*, supra, 412 F.2d at 96. Similarly, proof showing only pre-employment interrogation without any antiunion threats was viewed as insufficient support for such a finding. *NLRB v. MacCollum Paper Co.*, supra, 367 F.2d at 764. The issue is whether the proof demonstrates interference, restraint or coercion of employees in violation of § 8(a)(1). The core of the unfair labor practice lies in the element of coercion and does not extend to a total restriction against argumentative discussion of the effect of unionization, argumentative discussion itself being protected by § 8(c) of the Act. *NLRB v. Thompson Transport Co.*, 406 F.2d 698, 702 (10th Cir.); [10] *NLRB v. Automotive Controls Corp.*, 406 F.2d 221, 223–34 (10th Cir.).

■ The determination of an unfair labor practice charge arising out of employee interrogation necessarily involves an exercise of judgment and is a matter initially for the Board. *NLRB v. Gold Spot Dairy, Inc.*, 417 F.2d 761, 762 (10th

Cir.). In making that determination it is peculiarly the province of the Board to draw permissible inferences from credible testimony. Id.; *NLRB v. Thompson Transport Co.*, supra, 406 F.2d at 702. Our function is limited to determining whether the findings of violations are supported by substantial evidence on the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 491, 71 S.Ct. 456, 95 L.Ed. 456.

■ We must view the company's whole course of conduct. See *NLRB v. Thompson Transport Co.*, supra, 406 F.2d at 702. We note that there were some four instances of interrogation occurring over several weeks, according to the facts as found by the Judge and accepted by the Board. The men were called into the terminal manager's office where the conversations were between just Stinson and one man each time, and inquiries were made about the attitudes of the men questioned and others toward the union. There was the observation that such conversation was "out of the ordinary". In this connection we note too that no purpose for the questions was stated and no assurance against reprisal was given. See *NLRB v. Miller Trucking Service, Inc.*, 445 F.2d 927, 930 (10th Cir.). And, of course, the incidents occurred against the background of the organizational drive. While the proof is not strong, we feel it supports the Board's inferences and the finding of a violation of § 8(a)(1). Accordingly, we sustain the Board's finding and will enforce the remedial order. *NLRB v. Gold Spot Dairy, Inc.*, supra, at 763–64.

Enforcement will be granted.

---

10. § 8(c) provides essentially that expressing of views, argument or opinion, or the dissemination thereof, shall not constitute or be evidence of an unfair labor practice, if such expression contains no threat of reprisal or force or promise of benefit. See 29 U.S.C.A. § 158(c).